Eula Mae WEBB, Independent Executrix of the Estate of George H. Webb, deceased, Petitioner,

v.

DESSERT SEED COMPANY, INC., Respondent,

and

Kenneth Fagerberg; David J. Fagerberg, Jr.; Richard C. Fagerberg; Lynn Fagerberg; Rhinie Brunner; Brancucci Produce Company, Inc., a Colorado Funding Company, d/b/a Brancucci Produce Company, Respondents.

Kenneth FAGERBERG; David J. Fagerberg, Jr.; Richard C. Fagerberg; Lynn Fagerberg; Rhinie Brunner; Brancucci Produce Company, Inc., a Colorado Funding Company, d/b/a Brancucci Produce Company, Petitioners,

v.

Eula Mae WEBB, Independent Executrix of the Estate of George H. Webb, deceased, Respondent,

and

Dessert Seed Company, Inc., Respondent.

Nos. 83SC428, 83SC455.

Supreme Court of Colorado, En Banc.

May 5, 1986.

Rehearing Denied June 9, 1986.

West & Winters, William L. West, Denver, for Webb.

Sutherland & Gerber, Lowell F. Sutherland, El Centro, Cal.; Renner & Rodman, John R. Rodman, Denver, Colo., for Dessert Seed Co., Inc.

Sherman & Howard, Michael A. Williams, Kenneth B. Siegel, Denver, for Fagerbergs, Brunner, and Brancucci.

ROVIRA, Justice.

We granted two petitions for certiorari to review the opinion of the Colorado Court of Appeals in *Fagerberg v. Webb*, 678 P.2d 544 (Colo.App.1983), an appeal from the Weld County District Court. We now reverse the judgment of the court of appeals in Case No. 83SC455 and reverse in part, affirm in part, and remand for further proceedings in Case No. 83SC428.

## I.

In April of 1974, Dessert Seed Company, Inc. (Dessert Seed), an importer of onion seeds which sells between one-third and one-half of all the onion seeds sold in the United States, entered into a contract to sell 1,200 pounds of Yellow Spanish Utah onion seeds to George Webb. Webb owns a farm which grows seeds into small plants that are sold to other farmers who transplant them and grow them into mature plants. Due to a crop failure, and resulting nationwide shortage of all types of Yellow Spanish onions, Dessert Seed could not fulfill its contract with Webb. The contract was modified during a late fall 1974 telephone conversation between Joe Ahern, a Dessert Seed vice president, and both George Webb and his son, John, who manages Webb's farm. The Webbs called Ahern in California from their farm in Texas. Ahern testified that he told the Webbs that Dessert Seed could sell them a different kind of onion seed, Giant Yellow Zittau, which could only be used in the garden trade in the Northeast and Upper Midwest.[1] According to the Webbs, however, Ahern told them that Zittau seeds were Spanish-type seeds, grew like Yellow Spanish Utah seeds, and could take the place of Yellow Spanish Utah seeds.

George Webb offered to buy 800 pounds of the Zittau seeds, and Ahern assented. The prior written contract which was modified by this conversation stated that delivery would be "f.o.b. Growing Stations." According to the agreement, Dessert Seed assumed all responsibility for delivery of the Zittau seeds to Webb's farm in Texas. Dessert Seed does not dispute this aspect of the agreement. When the seeds arrived in Texas, they were labeled as Giant Yellow Zittaus.

The Webbs grew the seeds into small plants. Representing the plants as "Yellow Spanish," the Webbs sold the plants through a produce broker, C.H. Robinson Company, to Brancucci Produce Company

---

**1.** "Garden trade" refers to nurseries and other distributors who sell to recreational growers, as opposed to commercial farms.

(Brancucci), which, in April 1975, sold them to the Fagerbergs, who were northern Colorado farmers.[2] The Fagerbergs planted the Zittau transplants shortly thereafter. The plants failed to bulb properly, and therefore did not produce commercially salable onions. Expert testimony established that the plants failed to bulb properly primarily because Northern European onions such as the Zittau need longer periods of sunlight than that available in northern Colorado. Plaintiffs' expert, Dr. Richard Foskett, testified that he would not expect Zittaus to produce mature bulbs within the continental United States. A text on onions written by Dr. Henry Jones, a Dessert Seed employee and a widely acknowledged expert in the field of onion breeding, clearly warned that such seeds might not produce onion bulbs even in the most northern parts of the United States, where summer days are longest. Despite this knowledge, Dessert Seed failed to follow its normal practice of testing all new varieties of seeds under likely growing conditions prior to placing them in the market. Moreover, Dessert Seed had no previous experience raising Zittau onions and knew of no case in which Zittau seeds had been successfully raised on a commercial basis anywhere in the United States.

The Fagerbergs sued Brancucci for breach of implied warranties of merchantability and fitness for a particular purpose, negligence, and breach of contract. Brancucci in turn filed a third party complaint against Webb on the same grounds. Webb in turn sued Dessert Seed for negligence and breach of implied warranty of merchantability. Brancucci then filed a third party complaint against Dessert Seed alleging breach of both implied warranties and negligence. The Fagerbergs amended their complaint, adding claims against Dessert Seed on the same grounds asserted by Brancucci. Dessert Seed responded by cross claiming against Webb for indemnification. Several of the parties also filed various claims against Robinson, the produce broker, but all claims by and against Robinson were dismissed by the trial court. The court also dismissed claims for exemplary damages filed by several of the parties. Finally, the Fagerbergs filed a claim against Webb for breach of implied warranties of merchantability and fitness. However, they did not charge Webb with negligence.

Prior to the time they filed their warranty complaint against Webb, the Fagerbergs entered into an undated agreement with Brancucci, which provided that Brancucci would pay $200,000 and advance all costs of the litigation against Webb and Dessert Seed to the Fagerbergs. In consideration for these payments, the Fagerbergs agreed that Brancucci would first be entitled to recover the litigation costs and then the first $225,000 collected from Webb or Dessert Seed by way of judgment or settlement. The next $25,000 was earmarked for the Fagerbergs, with any remaining amount to be divided equally between the Fagerbergs and Brancucci. The agreement's "Recitals" stated that the Fagerbergs agreed to these terms because, *inter alia,* they needed funds to operate their farms and to pursue their claims against Dessert Seed. Once it received notice of the agreement, the trial court realigned Brancucci as a plaintiff.

After a three-week trial, the Fagerberg claims against Webb for breach of warranty and against Dessert Seed for negligence were presented to the jury in the form of special verdicts.[3] The jury found that Dessert Seed had acted negligently towards plaintiffs (defined in Jury Instruction No. 1 as both the Fagerbergs and Brancucci) and that Webb had breached its express and implied warranties to plaintiffs. Over

2. Five farmers (Kenneth Fagerberg, David J. Fagerberg, Jr., Richard C. Fagerberg, Lynn Fagerberg, and Rhinie Brunner) ultimately received the plants and became plaintiffs here. For convenience, we refer to them as "the Fagerbergs."

3. Although Brancucci was described as one of the plaintiffs in Jury Instruction No. 1, Brancucci's claims, including its negligence claim against Webb, were not presented to the jury in either the instructions or the special verdict forms.

Brancucci's objection, the court included a jury instruction and special verdict form that called for an assessment of each party's relative degree of negligence. Although Brancucci contended that consideration of comparative negligence was inappropriate in light of the fact that the Fagerbergs had not asserted a negligence claim against Webb, the court held that comparative negligence provided a proper method for assessing damages.[4] The jury assessed the parties' negligence as follows: Dessert Seed 40%, Webb 40%, Brancucci 13%, and Fagerbergs 7%. The jury determined that plaintiffs' total damages amounted to $521,182. The court denied Webb's and Dessert Seed's claims against each other for indemnity (pursuant to an agreement between Webb and Dessert Seed that their indemnity claims would be determined by the trial judge) and reduced the jury awards by the $200,000 that Brancucci paid the Fagerbergs.[5] The court of appeals reversed the jury's determination and held that the trial court should have granted Dessert Seed's motion for a directed verdict on the issue of its negligence. *Fagerberg v. Webb*, 678 P.2d 544, 547 (Colo. App.1983). The court of appeals also held that the judgments should not have been reduced by the amount of the settlement payment, *id.* at 548–49, and affirmed the denial of Webb's indemnity claim against Dessert Seed.[6]

Webb petitioned this court for certiorari, as did the Fagerbergs and Brancucci. In No. 83SC455, we granted the Fagerberg and Brancucci petition to review whether the court of appeals erred in reversing the jury's determination and holding that, as a matter of law, Dessert Seed was not negligent. We also granted certiorari on two issues raised by Webb in No. 83SC428: First, whether the trial court erred in rejecting Webb's claim for indemnification from Dessert Seed; and, second, whether the court of appeals erred by holding that the trial court's deduction of $200,000 from the jury's award was incorrect. We now reverse the judgment of the court of appeals in No. 83SC455, and reinstate the jury verdict finding that Dessert Seed was negligent. In 83SC428, we affirm the court of appeals holding that the $200,000 should not have been deducted from the jury awards, and remand for further proceedings on Webb's indemnification claim.

II.

The Fagerbergs and Brancucci argue that the court of appeals erred in dismissing their negligence claims on the ground that Dessert Seed owed no duty to the Fagerbergs or Brancucci other than to label the seeds properly. No one disputes that Dessert Seed fulfilled this duty. However, in determining that Dessert Seed vio-

**4.** This ruling and the propriety of the trial court's method of apportioning damages between a tortfeasor and a party in breach of commercial warranties have not been raised before this court and are therefore not at issue here.

**5.** The court concluded that the Fagerbergs were only entitled to recover court awarded damages totaling $321,182, pursuant to the Uniform Contribution Among Tortfeasors Act, section 13–50.-5–105(1)(a), 6 C.R.S. (1985 Supp.), since they had already "recovered" $200,000 from Brancucci, whom the court characterized as a "joint tortfeasor." Because the jury determined that both Webb and Dessert Seed were comparatively negligent, the trial court apparently also reasoned that they were jointly and severally liable. It entered judgment against Dessert Seed for $284,699.26 (the jury's award of $521,-182 reduced by $36,482.74 or 7% of the Fagerbergs' damages due to the Fagerbergs' contrib-

utory negligence, and further reduced by Brancucci's $200,000 payment to the Fagerbergs). The trial court also entered judgment against Webb for $321,182 (the jury's award minus the amount of Brancucci's payment to the Fagerbergs). The court declined to make a deduction for the Fagerbergs' comparative negligence on the grounds that the claims against Webb were based solely on breach of warranty. Thus, under the trial court's ruling, Webb and Dessert Seed were jointly liable to plaintiffs Fagerbergs and Brancucci in the amount of $284,699. Webb was also held solely liable for an additional $36,483.

**6.** The court of appeals did not explicitly address Webb's indemnity claims against Dessert Seed. It simply held that "Webb's other contentions of error," which included the indemnity claim, were "without merit." *Fagerberg v. Webb*, 678 P.2d at 548.

lated no duty of care owed to another party, the court of appeals stated, "It was not disputed that Dessert Seed did all that was required of it by statutes and the customs existing within the industry. All of the parties agreed that the basic and primary duty of a seed distributor is to properly label the seed." 678 P.2d at 547.

██ We find no agreement by either the Fagerbergs or Brancucci that Dessert Seed did all that was required of it. While the Fagerbergs and Brancucci agree that Dessert Seed had a duty to properly label its seeds, their allegations of negligence charge Dessert Seed with failing to follow its own customs and practices, which plaintiffs assert were representative of those within the industry. Further, while the authorities cited by the court of appeals reveal that seed distributors have a duty to properly label seeds, none of those authorities state that proper labeling is a seed distributor's *sole* duty. *See* Federal Seed Act, 7 U.S.C. §§ 1551 to 1611 (1982); Federal Seed Act Regulations, 7 C.F.R. §§ 201.1 to 202.44 (1985); *Agricultural Services Ass'n, Inc. v. Ferry-Morse Seed Co.*, 551 F.2d 1057 (6th Cir.1977); *Nakanishi v. Foster*, 64 Wash.2d 647, 393 P.2d 635, 640–52 (1964); *Hoskins v. Jackson Grain Co.*, 63 So.2d 514 (Fla.1953). On the contrary, case law from other jurisdictions establishes that seed distributors also owe a duty to exercise reasonable care to avoid foreseeable harm to users. *State ex rel. Western Seed Production Corp. v. Campbell*, 250 Ore. 262, 442 P.2d 215, 218–19 (1968), *cert. denied*, 393 U.S. 1093, 89 S.Ct. 862, 21 L.Ed.2d 784 (1969); *Nakanishi*, 393 P.2d at 642; *cf. Ebers v. General Chemical Co.*, 310 Mich. 261, 17 N.W.2d 176 (1945) (manufacturer of agricultural insecticide that failed to test its product held liable for harm caused to peach trees). This approach is consonant with Colorado's general negligence principles. In *Metropolitan Gas Repair Service, Inc. v. Kulik*, 621 P.2d 313, 317 (Colo.1980), we stated, "Where damage is to be foreseen, there is a duty to act so as to avoid it." *See also Westric Battery Co. v. Standard Electric Co.*, 482 F.2d 1307, 1313 (10th Cir.1973) (stating that a manufacturer's failure to make reasonable tests of a new product constitutes negligence under Colorado law). Thus, Jury Instruction No. 14 correctly addressed Dessert Seed's duty to the Fagerbergs:

> In order for the plaintiffs Fagerbergs and Brunner to recover from the defendant Dessert Seed on their claims of negligence, you must find all of the following have been established:
>
> . . . .
>
> (2) Dessert Seed was negligent in selling the seeds in that it failed to exercise reasonable care to prevent the seeds from creating an unreasonable risk of harm to the property of one who might reasonably be expected to use, consume or be affected by the Zittau seeds while they were being used in the manner the defendant might reasonably have expected. . . .

Dessert Seed argues that the jury's finding that Dessert Seed's actions were a proximate cause of plaintiffs' injuries is inconsistent with the jury's special finding that Webb's actions were not "of a nature which would have been foreseen by a reasonably prudent person under the same or similar circumstances as Dessert Seed." Dessert Seed contends that because Webb's action in relabeling the seeds was an unforeseeable intervening act, Dessert Seed was not negligent as a matter of law. We disagree.

██ An actor may be held liable for a plaintiff's injury where the actor was negligent and his negligence constituted a substantial factor in causing plaintiff's injury even where the actor did not and could not foresee the precise manner in which the injury would come about. *Johnson v. Kosmos Portland Cement Co.*, 64 F.2d 193 (6th Cir.), *cert. denied*, 290 U.S. 641, 54 S.Ct. 60, 78 L.Ed.2d 557 (1933); W.L. Prosser and W.P. Keeton, *The Law of Torts* § 44 at 316–19 (5th ed. 1984). The American Law Institute has adopted this rule in its Restatement (Second) of Torts §§ 435(1) and 442B (1965):

§ 435. Foreseeability of Harm or Manner of Its Occurrence.

(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

. . . .

§ 442B. Intervening Force Causing Same Harm as That Risked by Actor's Conduct.

Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.

■ Had Dessert Seed not imported the Zittau seeds, the damage to the Fagerbergs obviously would not have occurred. Dessert Seed argues that it tried to prevent the damage by attempting to limit the seed to "the garden trade." However, the evidence presented at trial shows that Dessert Seed had never limited seed distribution to a particular category of growers in the past and knew of no way to impose such a limitation in the present case. In light of the evidence that Dessert Seed had no ability to limit the transplants to the garden trade, since the Zittau transplants were identical in appearance to Yellow Spanish Utah transplants and since there was a shortage of Yellow Spanish transplants, Dessert Seed could have foreseen that commercial growers might be sold Zittau transplants as a substitute for Yellow Spanish onions. Indeed, Ahern specifically testified that he was worried this very situation might happen.

■ Moreover, the evidence indicates that Yellow Zittau seeds and plants have no value whatsoever to commercial growers. Although Dessert Seed continues to assert that the onion plants could be sold as "bunching onions" (the trade term for green onions or scallions), its own seed catalogs state, "For [the commercial bunching onion] market it is essential to use the white varieties." Thus, Yellow Zittaus are not only unsalable in the bulb market, they also appear to be valueless as bunching onions. Based on this evidence, the jury reasonably concluded that even if Dessert Seed could not have anticipated that a plant grower would falsely market the plants, it clearly knew that if Zittau seeds were sold to commercial growers in this country someone would be harmed. Since the harm that actually took place, the purchase and planting by commercial growers of onions that could not bulb and were not commercially salable, is exactly that harm that was a foreseeable result of the decision to sell the Zittaus, that harm was within the scope of the risk created by Dessert Seed's conduct. Restatement (Second) of Torts §§ 435(1), 442B. The fact that Dessert Seed could not have anticipated Webb's relabeling therefore does not shelter it from tort liability.

■ In concluding that Dessert Seed was not negligent, the court of appeals also relied on a belief that Dessert Seed imparted all of its knowledge about Zittau onions to Webb before Webb agreed to buy the onions:

It was further undisputed that Dessert Seed passed along to Webb all that it knew of the growing characteristics of "Zittau" onion seeds. Specifically, it was acknowledged at trial that Dessert Seed cautioned Webb that "Zittau" onion seeds would only produce bulbs in the very northern part of the United States.

*Fagerberg v. Webb*, 678 P.2d at 547. Our review of the record, however, reveals that the nature of the information passed on by Dessert Seed was hotly disputed. George and John Webb both testified that Ahern told them that Giant Yellow Zittau onion seeds are a substitute for and grow like Yellow Spanish Utah onion seeds. Ahern denied this. Ahern added that he told the Webbs that they could only use Zittaus for

the garden trade in the Northeast and Upper Midwest. Ahern testified that he told the Webbs this precisely because he was worried that the seeds might be planted in an area in which they would not grow properly. The Webbs deny this version of the conversation.

Answers to special verdict questions support the conclusion that the jury believed the Webbs' version of this conversation. The first question in Special Verdict No. 3 asked: "Do you find that George H. Webb intentionally misrepresented the plants grown from Giant Yellow Zittau seeds as Yellow Spanish plants knowing that they were not Yellow Spanish plants? (yes or no)." The jury answered "no." The only basis in the record for this view is the Webbs' testimony that Ahern told them the Zittaus would grow like and were substitutes for Yellow Spanish onions.

Dessert Seed argues that the jury's answer to another special verdict question negates the conclusion that the jury believed the Webbs. Dessert Seed relies on the jury's response to the third question in Special Verdict No. 3, which asked: "Do you find that the third-party defendant, Dessert Seed Company, Inc., expressly warranted to George H. Webb that seeds of the Giant Yellow Zittau variety would produce onions the same as the Yellow Spanish Utah variety? (yes or no)." Although the jury answered negatively, its response does not necessarily indicate that it disbelieved the Webbs' version of the conversation in question. The Webbs testified that Ahern said the Zittau seeds were a substitute for and grew like Yellow Spanish seeds, not that the Zittaus were "the same as" Yellow Spanish Utahs, a particular subvariety of Yellow Spanish onion.

Although the court of appeals correctly stated the rule for granting a directed verdict, it applied that rule incorrectly in the case at bar. Citing our holding in *McGlasson v. Barger*, 163 Colo. 438, 431 P.2d 778 (1967), the court held that:

A motion for directed verdict can only be granted where the evidence, when so considered, compels the conclusion that

the minds of reasonable persons could not be in disagreement and that no evidence, or legitimate inference arising therefrom, has been presented upon which a jury's verdict against the moving party, Dessert Seed, could be sustained. *Fagerberg v. Webb*, 678 P.2d at 547. The Webbs' testimony about their conversation with Dessert Seed's vice president, Ahern, supports the view that Dessert Seed breached its duty of reasonable care when it failed to warn the Webbs that Zittaus probably would not produce commercially salable onions in the contiguous United States, and actually led the Webbs to believe that the Zittaus would be appropriate for northern Colorado commercial growers. In addition, Ahern's own testimony supports the view that, before it sold the seeds in question, Dessert Seed foresaw the harm that occurred here. Thus, reasonable jurors could have concluded that Dessert Seed was negligent. *Safeway Stores v. Langdon*, 187 Colo. 425, 429–30, 532 P.2d 337, 340 (1975); *McGlasson*, 163 Colo. at 442, 431 P.2d at 779. We therefore reverse the judgment of the court of appeals and reinstate the jury's verdict of negligence against Dessert Seed.

### III.

■ Webb argues that the court of appeals erred in rejecting his claim for indemnification from Dessert Seed predicated on negligence and breach of warranty. Joint tortfeasor status occupies a central position in Webb's first set of arguments on this issue. Webb argues that its situation is analogous to that of a manufacturer/middleman under Restatement (Second) of Torts § 886B and Restatement of Restitution § 93(1). However, each of these provisions applies only to indemnity between joint tortfeasors. *See* Restatement (Second) of Torts § 886B(1) (1979); Restatement of Restitution § 93 comment a (1937). Although the trial court's instructions permitted the jury to allocate negligence between Webb and Dessert Seed, they are not joint tortfeasors because Webb was never joined in the Fagerbergs' tort action and because Brancucci's tort claims against

Webb did not reach the jury. Webb's liability is based solely on plaintiffs' breach of warranty claims. Webb cites no authority which states that either of these Restatement provisions should be applied to indemnity actions that do not involve joint tortfeasors. Our review of the case law in this area discloses no such authority.

■ Webb also argues that Dessert Seed should indemnify Webb since Dessert Seed's negligence was the primary cause of the Fagerbergs' damages. However, the "primary cause" principle also applies to indemnification between joint tortfeasors. *Ringsby Truck Lines, Inc. v. Bradfield,* 193 Colo. 151, 155, 563 P.2d 939, 942 (1977); *Bendix-Westinghouse Automotive Air Brake Co. v. Latrobe Die Casting Co.,* 427 F.Supp. 34, 40–41 (D.Colo.1976); *Bass v. United States,* 379 F.Supp. 1208, 1209 (D.Colo.1974). Webb cites no authority for extending this principle to indemnity actions that do not involve joint tortfeasors. Moreover, even if the jury's comparative negligence verdict had rendered Webb and Dessert Seed joint tortfeasors, Dessert Seed's negligence could not be characterized as the "primary cause" of the Fagerbergs' harm since the jury assigned the same percentage of comparative negligence to both Webb and Dessert Seed. Webb's "negligence" also appears to be of the same basic type as Dessert Seed's: Webb misrepresented the name of the seeds to the Fagerbergs and Brancucci, and Dessert Seed misrepresented and/or failed to warn of the seeds' nature. The Fagerbergs' testimony that they would not have bought the plants if they had been told that they were Zittau rather than Yellow Spanish further negates Webb's assertion that the relabeling was not a primary cause of plaintiffs' harm.

Webb also contends that he is entitled to indemnification because Dessert Seed breached its implied warranties of merchantability and fitness for a particular purpose. Since this claim is grounded in

commercial law, it does not rely on a characterization of Webb and Dessert Seed as joint tortfeasors and therefore merits further consideration.

The fifth question in Special Verdict No. 3 asked: "Were the Zittau seeds sold by Dessert Seed Company, Inc., to George H. Webb merchantable for the ordinary purpose for which they were sold? (yes or no)." The jury answered "no." However, the trial court denied Webb's breach of warranties claim for indemnification because the jury determined that Webb did not provide Dessert Seed with sufficient notice of the breach within a reasonable time after Webb discovered or should have discovered it. Webb argues that the jury's answer may have been influenced by an improper instruction. We agree.

Jury Instruction No. 28 closely parallels the language of CJI–Civ.2d 14:15 (1982) ("Notice is sufficient if it informs the defendant of the alleged breach of warranty."), but includes an additional paragraph that supplies a stricter and conflicting standard for the sufficiency of notice as related to Webb's indemnity claim for breach of warranties: "To be sufficient, a notice must notify the seller that a claim for damages is being made and give the seller sufficient facts to allow him to make a reasonable investigation of the claim." The trial judge included this language because he determined that the Dessert Seed/Webb contract was a "California Sale."[7] He therefore concluded that California law, which has strict sufficiency of notice requirements, applied to Webb's warranty claim. *See Bendix-Westinghouse Automotive Air Brake Co. v. Swan Rubber Co.,* 55 Cal.App.3d 256, 127 Cal. Rptr. 571, 573 (1976); *but see* Cal. Jury Instructions Civ. [BAJI] 9.90 (7th ed. 1986) (stating only that "notice ... must inform the seller of the alleged breach of warranty and the buyer's intention to look to the seller for damages."). Jury Instruction No. 27, which involved the notice require-

---

**7.** Dessert Seed contends that this is a California sale because the contract was formed when Ahern, who was in his California office during

the telephone conversation that resulted in the contract modification, accepted Webb's offer to buy 800 pounds of Zittau seed.

ment for plaintiffs' breach of warranty claims against Webb, did not contain this language because the trial judge decided that Colorado law applied to that transaction, and Colorado's notice requirements are less stringent. *See Prutch v. Ford Motor Co.,* 618 P.2d 657 (Colo.1980); CJI–Civ.2d 14:15 (1980).

■ We believe that the trial judge's conflict of laws ruling was incorrect as to Webb's claim against Dessert Seed. In *Wood Brothers Homes, Inc. v. Walker Adjustment Bureau,* 198 Colo. 444, 447, 601 P.2d 1369, 1372 (1979), we adopted the "most significant relationship" approach of Restatement (Second) of Conflict of Laws for resolving conflict of laws questions in contract cases. According to section 191 of the Restatement, which deals with conflicts of law in the area of breach of a seller's express or implied warranties:

> The validity of a contract for the sale of an interest in a chattel and the rights created thereby are determined ... by the local law of the state where under the terms of the contract the seller is to deliver the chattel unless, with respect to the particular issue, some other state has a more significant relationship ... to the transaction and the parties....

Restatement (Second) of Conflict of Laws § 191 (1971).

When the transaction occurred, one party was in California and the other was in Texas. Webb is a resident of Texas; Dessert Seed is a California corporation. The harm from the breach occurred neither in Texas nor in California, but in Colorado. Likewise, the forum state was neither Texas nor California. Where, as here, neither California nor Texas shows a "more significant relationship" to Webb's claim, section 191 provides that "the local law of the state where under the terms of the contract the seller is to deliver the chattel" should control. Comment d to section 191 adds, "The place of delivery is the place where ... the seller 'completes his performance with reference to the physical delivery' of the chattel." No one disputes that Dessert Seed was obliged to deliver the seed to Texas.

The original contract provides that delivery will be "f.o.b. Growing Stations," and Webb stated that Dessert Seed assumed all responsibility for delivery of the seed to Texas. Therefore, under the Restatement rule, Texas law should be applied both to the Dessert Seed/Webb contract and any warranties arising out of that contract.

Texas law is less stringent regarding sufficiency of notice than the notice standard set forth in Jury Instruction No. 28. In Texas, "a general expression of dissatisfaction" is sufficient notice for breach of warranty claims. *Vintage Homes, Inc. v. Coldiron,* 585 S.W.2d 886, 889 (Tex.Civ. App.1979); *Melody Home Mfg. Co. v. Morrison,* 502 S.W.2d 196, 203 (Tex.Civ.App. 1973); *see also* Tex. [Bus. & Com.] Code Annot. § 2.607 U.C.C. Comment 4 (Vernon 1968). This Texas standard is much more lenient than the requirement of Instruction No. 28 that the notice both "notify the seller that a claim for damages is being made and give the seller sufficient facts to allow him to make a reasonable investigation of the claim."

■ The record supports the view that the jury might have answered differently on the sufficiency of notice question if a proper instruction had been given. The Fagerbergs did not discover that the onions had not bulbed until sometime during the latter half of the summer of 1975. Both Ahern and George Webb testified that Webb told Ahern at the end of August 1975 that there were "problems" with the onions after Webb was notified of the problems earlier that month. Ahern then wrote two letters to Webb (dated August 28, 1975, and September 2, 1975) showing his awareness of the problem. This exchange could reasonably be viewed as a "general expression of dissatisfaction," which would have constituted sufficient notice under Texas law. *Vintage Homes.*

In light of the jury's determination that the seeds sold by Dessert Seed to Webb were not merchantable for the ordinary purpose for which they were sold, *see* Tex. [Bus. & Com.] Code Annot. § 2.314(b)(3) (Vernon 1968), if the jury had been proper-

ly instructed on the sufficiency of notice, the result of Webb's indemnification claim based on breach of warranty probably would have been different. *See Mendez v. Pavich*, 159 Colo. 409, 411–12, 412 P.2d 223, 224 (1966) (instruction that is so erroneous that it would probably lead jury into error requires retrial); *see also Noel v. Jones*, 142 Colo. 318, 320, 350 P.2d 815, 816 (1960) (reversal required where conflicting instructions leave appellate court unable to determine which instruction the jury followed). We therefore remand for a new trial on the issue of Webb's breach of warranty claims against Dessert Seed.

## IV.

 Finally, both Webb and Dessert Seed contend that the court of appeals erred in holding that the trial court's deduction of $200,000 from the jury award was incorrect. They argue that the trial court correctly characterized the agreement between Brancucci and the Fagerbergs as a "settlement among joint tortfeasors," and assert that deduction of the amount of the settlement is necessary to prevent double recovery. We disagree.

The agreement between the Fagerbergs and Brancucci is a variant of a loan receipt agreement, a written contract under which a settling defendant advances to a plaintiff a sum of money as an interest-free loan which serves as a settlement of the dispute between the two parties. *See* Comment, *Settling Multiparty Contract Disputes Through the Use of Loan Receipt Agreements*, 76 Nw. U.L.Rev. 271, 276 (1981) (hereinafter *Loan Receipt Agreements*); Annot., 62 A.L.R.3d 1111, 1114–15 (1975). Insurers first used loan receipt agreements to expedite payments to insureds who had suffered losses caused by third parties. The agreements were structured to prevent potentially liable third parties from claiming that the insurance proceeds constituted full compensation for the insured's loss. By framing the fund transfer as a loan, the insurer could provide prompt compensation without sacrificing rights against third parties. *Id.; see also Luckenbach v. W.J.*

*McCahan Sugar Refining Co.*, 248 U.S. 139, 148–49, 39 S.Ct. 53, 55, 63 L.Ed. 170 (1918) (upholding validity of loan receipt agreement between insurer and insured). In recent years, the use of loan receipt agreements has spread beyond the insurance context to other areas of multiparty law, including tort claims against alleged joint tortfeasors. *Loan Receipt Agreements*, 76 Nw. U.L.Rev. at 276; *see also Reese v. Chicago, B. & Q. R.R.*, 55 Ill.2d 356, 303 N.E.2d 382, 386 (1973).

We upheld the validity of a loan receipt agreement in *Wilson v. Anderson*, 113 Colo. 396, 157 P.2d 690 (1945), an action for property damage against a motorist whose vehicle collided with a storage van transporting the plaintiff's household furniture. The court rejected defendant motorist's contention that the loan receipt agreement between plaintiff and the storage company constituted a release of the company, an alleged joint tortfeasor, which discharged defendant by operation of law. *Id.* at 400, 157 P.2d at 692. More significantly for the case at bar, we also refused to reduce plaintiff's recovery against the defendant motorist by the amount of the loan, *Id.* at 401, 157 P.2d at 692, thereby adopting the rule now followed by a number of jurisdictions that money received under a valid loan receipt agreement is not a payment entitling co-tortfeasors to a reduction in judgment. *See, e.g., Western Spring Service Co. v. Andrew*, 229 F.2d 413, 420 (10th Cir.1956); *Reese*, 303 N.E.2d at 385–86; *Pacific Indemnity Co. v. Thompson-Yaeger, Inc.*, 258 N.W.2d 762, 765 (Minn.1977); *Loan Receipt Agreements*, 76 Nw. U.L. Rev. at 292 (although courts split on validity of loan receipt agreements in tort disputes, recent trend has been to permit their use); *see generally* Annot., 62 A.L.R.3d 1111, § 5[d] (1975 & 1985 Supp.) (collecting cases).

The agreement before us here differs from the standard loan receipt agreement and the agreement considered in *Wilson v. Anderson* in that here Brancucci may recover more than the amount it paid to the Fagerbergs. In essence, Brancucci has in-

vested in the Fagerbergs' causes of action against Webb and Dessert Seed. Thus, the agreement is in some ways equivalent to a partial assignment of the Fagerbergs' negligence and commercial warranty claims.

Certain loan receipt agreements have been criticized on the grounds that they constitute circumvention of prohibitions against the assignment of certain causes of action. *See, e.g., Reese,* 303 N.E.2d at 387 (Schaefer, J., dissenting) (arguing that agreement in question violated prohibition against assigning personal injury and wrongful death claims); McKay, *Loan Agreement: A Settlement Device that Deserves Close Scrutiny,* 10 Val.U.L.Rev. 231, 254 (1976); *but see Cullen v. Atchison, T. & S. F. Ry. Co.,* 211 Kan. 368, 507 P.2d 353, 360 (1973) (loan receipt agreement did not constitute unlawful assignment of a tort claim); *Biven v. Charlie's Hobby Shop,* 500 S.W.2d 597, 599 (Ky.1973) (same). However, this concern over unlawful assignment arises only where formal assignment of the claims in question would be prohibited. Here, the Fagerbergs' breach of warranty claims, which are causes of action based on the Uniform Commercial Code, are freely assignable. § 4-2-210(2), 2 C.R.S. (1973). The Fagerbergs' negligence claims for property damage may also be assigned. *Home Ins. Co. v. Atchison, T. & S. F. Ry. Co.,* 19 Colo. 46, 49, 34 P. 281, 282 (1893) (holding claim for fire damage caused by alleged negligence of railroad was assignable); *see generally* 6 Am.Jur.2d, *Assignments* § 43 (1963) (tort claims for damage to personal property fully assignable in most states); Annot., 57 A.L.R.2d 603 (1958) (collecting cases). Thus, even if the loan receipt agreement constitutes an assignment of part of the Fagerbergs' claims to Brancucci, that assignment would not be contrary to law. The issue of whether certain loan receipt agreements might be used to circumvent prohibitions against assignments of causes

of action for personal injuries or for wrongful death is not before us, and we express no opinion concerning this matter.

The payment of $200,000 by Brancucci to the Fagerbergs did not require a reduction in the Fagerbergs' recovery. *Wilson v. Anderson.* Contrary to the determination of the trial court, failure to deduct $200,000 from the final judgment will not result in a double recovery because, under the agreement, the Fagerbergs are required to transfer to Brancucci more than the $200,000 they originally received from Brancucci. Since the jury award did not result in a double recovery for the Fagerbergs, the trial court erred in reducing that award.

Finally, we note that the language used by the court of appeals in reaching this result could create confusion. In considering the trial court's deduction from the jury verdict, the court of appeals stated:

> The jury found that Webb was liable to the Fagerbergs for breach of warranty. The total amount of that liability was determined to be $521,182. This liability is solely that of Webb, and he is responsible for satisfying it in full. Regardless of the agreement between Brancucci and the Fagerbergs, Webb's liability is fixed at $521,182.

*Fagerberg v. Webb,* 678 P.2d at 548–49. Under this analysis, the issue appears to turn on the court's incorrect conclusion that Dessert Seed was not liable to the Fagerbergs. However, the deduction was not inappropriate because Webb was "solely liable" for the $521,182. Rather, the Fagerbergs' obligation to return the $200,000 advanced by Brancucci prevented that pretrial transfer from being a "recovery" by the Fagerbergs. As such, the deduction of $200,000 by the trial court based on a double recovery theory was error which the court of appeals properly reversed.[8]

---

**8.** Reversing the trial court's $200,000 deduction for the Brancucci settlement but otherwise retaining its method of calculating defendants' liability yields the following judgments (rounded to the nearest dollar): Dessert Seed—$484,-

699 ($521,182 minus the 7% attributable to the Fagerbergs' comparative negligence), Webb—$521,182 (of which $484,699 constitutes joint liability with Dessert Seed).

V.

In summary, we reverse the court of appeals' holding that a directed verdict for Dessert Seed should have been granted. The jury's verdict against Dessert Seed is reinstated. Since Texas law governs the contract between Webb and Dessert Seed, we hold that the jury's finding that Webb failed to meet the notice requirements for an indemnity action on breach of warranty was based on an erroneous instruction. We therefore reinstate Webb's indemnity claim and remand for a new trial on that claim. Finally, we hold that the award to the Fagerbergs did not constitute double recovery and therefore affirm the court of appeals' holding that the deduction of $200,000 from that award constituted error.

Accordingly, we affirm in part and reverse in part. The cause is remanded to the court of appeals for further proceedings consistent with this opinion.

KIRSHBAUM, J., does not participate.