**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 14 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RICHARD F. VITKUS,

        Plaintiff - Counter -
        Defendant - Appellee,

NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PA, a Pennsylvania
corporation,

        Plaintiff - Intervenor -
        Counter - Defendant -
        Appellee,

      v.

BEATRICE COMPANY, a Delaware
corporation,

        Defendant - Counter -
        Claimant - Appellant.

No. 96-1240

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D. Ct. No. 91-M-1043)**

Terence P. Boyle, Boyle Partnership, Denver, Colorado (Leo A. Knowles and
Pamela K. Black, McGrath, North, Mullin & Kratz, P.C., Omaha, Nebraska, with
him on the briefs), appearing for Appellant.

Barry D. Hovis, Hovis, Smith, Stewart, Lipscomb & Cross, LLP, San Francisco, California (Roger P. Thomasch and Leslie A. Eaton, Ballard, Spahr, Andrews & Ingersoll, Denver, Colorado, with him on the brief), appearing for Appellee Richard A. Vitkus.

James M. Lyons, Rothgerber, Appel, Powers & Johnson, LLP, Denver, Colorado (JoAnn L. Vogt, Rothgerber, Appel, Powers & Johnson, LLP, Denver, Colorado, and Kenneth A. Sagat, D'Amato & Lynch, New York, New York, with him on the brief), appearing for Appellee National Union Fire Insurance Company of Pittsburgh, PA.

---

Before SEYMOUR, Chief Judge, and PORFILIO and TACHA, Circuit Judges.

---

TACHA, Circuit Judge.

---

This is an action for damages resulting from defendant Beatrice Company's alleged breach of contract to provide insurance and indemnification protection to plaintiff Richard Vitkus, an outside director of the failed Silverado Banking, Savings and Loan Association. The issues raised in this appeal require us to determine whether Beatrice is obligated to pay part of a $26.5 million global settlement that resolved litigation brought by the Federal Deposit Insurance Corporation against several defendants associated with Silverado. After a bench trial, the district court found that Beatrice had breached its contract to indemnify Vitkus and that plaintiff National Union Fire Insurance Company could recover damages from Beatrice under a contractual right of subrogation. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## BACKGROUND

The historical facts relating to this appeal, including the failure of Silverado, the $26.5 million global settlement, and Vitkus's suit against Beatrice for indemnification, are set forth fully in two prior related appeals, National Union Fire Ins. Co. v. Emhart Corp., 11 F.3d 1524 (10th Cir. 1993), and Vitkus v. Beatrice Co., 11 F.3d 1535 (10th Cir. 1993). Therefore, we need only recount the additional relevant facts and the procedural background below.

In 1978, Vitkus became an officer of Beatrice Companies, Inc. (BCI), defendant Beatrice's predecessor. In 1983, Vitkus began serving on the board of directors of Silverado at the request of BCI and continued as a board member until the FDIC seized Silverado in December 1988. In April 1986, BCI merged with a holding company controlled by Kohlberg, Kravis & Roberts. The surviving company eventually changed its name to Beatrice Company. At the time of the merger, BCI maintained a $10 million directors and officers' (D&O) liability policy with Lloyd's of London. Under the merger agreement, Beatrice agreed to maintain D&O coverage, at terms no less advantageous than those in the Lloyd's policy, for a period of six years from the effective date of the merger. Lloyd's canceled its D&O policy shortly after the merger. Thereafter, Beatrice failed to purchase replacement D&O coverage, and thus became a self-insurer, with the scope of its obligations measured by the Lloyd's policy.

Vitkus's employment with Beatrice ended in January 1987. In May 1988, Vitkus began employment with Emhart Corporation, which had a D&O policy issued by National Union. Emhart obtained an endorsement to its $25 million D&O policy with National Union to cover Vitkus's service on the Silverado board; that endorsement became effective on May 23, 1988. The National Union policy provided "excess coverage"--coverage only for amounts exceeding Vitkus's other insurance protection relating to his activities at Silverado. In December 1988, the FDIC seized Silverado.

In September 1990, the FDIC brought suit in federal court against Vitkus, ten other officers and outside directors, Silverado's outside law firm Sherman & Howard, and Sherman & Howard partner Ronald Jacobs, seeking damages for transactions that occurred between December 6, 1985 and March 17, 1987, and that led to Silverado's collapse. Vitkus requested that Beatrice pay his defense costs and indemnify him under the terms of the merger agreement and the endorsement to the Lloyd's policy. Beatrice refused. Vitkus also requested that National Union pay his defense costs and indemnify him under the terms of the endorsement to Emhart's D&O policy. At the end of March 1991, National Union agreed to pay such costs. National Union also insured Sherman & Howard and Ronald Jacobs under a $30 million professional liability policy. None of the other defendants had insurance coverage.

In April 1991, the parties convened a settlement conference. Beatrice refused to participate in that conference. On May 1, 1991, Vitkus served Beatrice as a third-party defendant. In early June, before Beatrice answered the third-party complaint, National Union, the FDIC, and all of the original defendants entered into a global settlement whereby National Union agreed to pay the FDIC $26.5 million in exchange for the release of all the defendants. So that the district court could announce that the entire case had settled, Vitkus agreed to dismiss its third-party complaint against Beatrice and soon refiled it as this action.

The settlement agreement provided that if the $26.5 million payment was not made by a certain payment date, none of the individual settling parties would be obligated to pay anything to the FDIC, and that the FDIC's sole remedy would be to terminate the agreement and continue the lawsuit. National Union paid the $26.5 million settlement by the payment date.

The settlement, as approved by the court, did not allocate liability among the defendants. Each uninsured defendant agreed to pay National Union a small portion of the settlement. Those payments to National Union totaled approximately $300,000. After the settlement agreement was executed, National Union, Sherman & Howard, Jacobs, and Vitkus entered into an allocation agreement whereby $10 million of the settlement was allocated to Vitkus and $16.5 million was allocated to Sherman & Howard and Jacobs. On June 12, 1991,

one day after parties had tentatively agreed to the allocation, Vitkus's counsel made a written request to Beatrice's counsel that Beatrice consent to the allocation and indemnify Vitkus for the $10 million. By letter dated that same day, Beatrice's counsel refused to give such consent or indemnify Vitkus.

Less than one week later, Vitkus and National Union instituted this action against Beatrice to enforce Beatrice's obligation to indemnify Vitkus under the terms of the Lloyd's policy. The Lloyd's policy extended coverage to Beatrice's directors and officers for "all loss which such Directors and Officers shall become legally obligated to pay" for wrongful acts committed in executing their corporate responsibilities. Aplt. App. 239. Endorsement No. 7 specifically extended coverage to Beatrice's officers and directors also serving as officers or directors of Silverado. The policy defined "loss" as "any amount which the Directors and Officers are legally obligated to pay . . . for a claim or claims made against them for wrongful acts, and shall include, but not be limited to, damages, judgments, and settlements, and costs, charges and expenses. . . ." Aplt. App. 259. The policy further provided:

> No settlement shall be made, without Underwriter's consent, such [consent] not to be unreasonably withheld. It shall be the duty of the Directors and Officers and not the duty of the Underwriters to defend claims made against the Directors and Officers. . . . Underwriters shall reimburse costs, charges and expenses only upon the final disposition of any claim made against the Directors and Officers.

Aplt. App. 260.

In this action, Vitkus seeks recovery for defense costs that he incurred in the Silverado litigation. National Union, as subrogee of Vitkus, seeks recovery of the $10 million it paid to settle the FDIC's claims against Vitkus, as well as National Union's attorneys' fees and costs expended on Vitkus's behalf in the litigation. After a bench trial, the district court determined that Beatrice had breached its obligation to indemnify Vitkus for loss arising from his service on the Silverado board of directors. The court awarded Vitkus $15,874.86 plus interest for his defense costs. It also awarded National Union $9,707,500 plus interest for the net amount National Union paid to settle the claims against Vitkus and $518,132.42 plus interest for attorneys' fees incurred to defend Vitkus.

On appeal, Beatrice argues that (1) National Union cannot assert claims against Beatrice as the subrogee of Vitkus, (2) Beatrice is not obligated to indemnify Vitkus under the terms of the Lloyd's policy, (3) the allocation to Vitkus of $10 million of the $26.5 million settlement with the FDIC was collusive, unreasonable, and in bad faith, and therefore unenforceable, and (4) National Union and Beatrice were co-insurers of Vitkus, and therefore the $10 million allocation should be divided between the two insurers pro rata according to the policy limits of the Lloyd's policy and Emhart's D&O policy with National Union.

**DISCUSSION**

A federal court sitting in diversity, as we do here, must apply the substantive law of the forum state, including its choice of law rules. New York Life Ins. Co. v. K N Energy, Inc., 80 F.3d 405, 409 (10th Cir. 1996). This case was tried in the United States District Court for the District of Colorado. Colorado follows the "most significant relationship" approach of Restatement (Second) of Conflict of Laws for resolving conflict of laws questions in contract cases. TPLC, Inc. v. United National Ins. Co., 44 F.3d 1484, 1490 (10th Cir. 1995) (citing Webb v. Dessert Seed Co., 718 P.2d 1057, 1066 (Colo. 1986) (en banc)).

It is, of course, important to first determine which contract is actually at issue in this case before applying the choice of law test. Beatrice's duty to indemnify Vitkus does not arise from the Lloyd's policy itself, under which Lloyd's assumed legal obligations. Rather, Vitkus became a third party beneficiary of Beatrice's merger agreement with BCI, which required Beatrice to "maintain the Company's current directors' and officers' insurance and indemnification policy or an equivalent policy, subject to terms and conditions no less advantageous" for six years after the merger. Aplt. App. 205. The parties have stipulated that Illinois law governs this merger agreement. Nonetheless, because the Lloyd's policy was Beatrice's "current insurance" at the time of the merger agreement, that policy defines the extent of Beatrice's legal

obligation. Thus, we must make a brief inquiry into the state law applicable to the Lloyd's policy.

The most significant relationship test requires us to consider five factors: place of contracting, place of negotiation, place of performance, location of the subject matter of the contract, and the domicile, residence, or place of business of the parties. TPLC, 44 F.3d at 1490 n.7 (quoting RESTATEMENT (2D) OF CONFLICT OF LAWS § 188(2) (1969)). Beatrice had its principal place of business in Illinois. The place of contracting was Illinois. The broker for the Lloyd's policy was located in Illinois. Thus, under the most significant relationship test, Illinois law governs the construction of the Lloyd's policy.

This Court previously noted that New York law controls the interpretation of Emhart's D&O policy with National Union, and thus of National Union's rights as Vitkus's subrogee. National Union Fire Ins. Co. v. Emhart Corp., 11 F.3d 1524, 1529 (10th Cir. 1993).

In applying the laws of Illinois and New York, we must apply the most recent statement of state law by the state's highest court; we are not required to follow the rulings of intermediate state courts, though we may treat such law as persuasive as to how the state supreme court might rule. K N Energy, 80 F.3d at 409.

Construction of insurance contracts is a matter of law to be determined by

the court.  See, e.g., Jones v. State Farm Mut. Auto. Ins. Co., 682 N.E.2d 238, 245 (Ill. Ct. App. 1997).  Accordingly, we review the district court's construction of the Lloyd's and Emhart policies de novo.  District court findings of fact, however, will not be disturbed unless clearly erroneous.  First Federal Savings & Loan v. Transamerica Title Ins. Co., 19 F.3d 528, 530 (10th Cir. 1994).

## I.  National Union's Right to Recover as Subrogee of Vitkus

In this case, National Union pursues its claim for breach of contract against Beatrice as subrogee of Vitkus.  Therefore we must determine, as a threshold matter, if National Union is a proper subrogee of Vitkus.  National Union bases its subrogation right on a subrogation clause contained in Emhart's D&O policy with National Union, which covered Vitkus's role on Silverado's board.  Beatrice asserts that National Union is not entitled to recover as subrogee because (1) Beatrice did not cause the loss in question, and (2) National Union did not pay any amounts under the Emhart policy.  Both of these arguments fail.

### A.  Did Beatrice "Cause the Loss"?

Beatrice argues that National Union cannot be subrogated to Vitkus's claim against Beatrice because Beatrice did not perform any wrongful act that caused the Silverado loss.  This argument misunderstands the doctrine of subrogation.  Under New York law, which governs the interpretation of the Emhart policy and which follows the majority rule, "a subrogee is not limited to asserting claims

- 10 -

against third-party wrongdoers, but may assert claims against the subrogor's contractual obligor as well." Dome Petroleum Ltd. v. Employers Mut. Liabil. Ins. Co., 767 F.2d 43, 45 (3d Cir. 1985). Subrogation is an equitable doctrine available to an insurer who pays its insured's debt even though that debt should have been discharged by a third party. Gerseta Corp. v. Equitable Trust Co., 150 N.E. 501, 504 (N.Y. 1926). The insurer "stands in the shoes" of its insured and can assert any rights against the third party that the insured would have been able to assert had the debt not been paid by the insurer. See, e.g., Dome Petroleum, 767 F.2d at 45.

In this case, National Union paid $10 million on Vitkus's behalf under the Emhart excess coverage policy to settle the FDIC's claims against Vitkus. National Union, standing in the shoes of Vitkus, may now request that a primary insurer pay the amount that Vitkus would have owed had he not received the protection of National Union. Thus, National Union is not prevented from being a subrogee because of Beatrice's failure to commit wrongdoing.

### B. Payment Under the Emhart Policy.

Beatrice also contends that the Emhart policy does not give National Union a right of subrogation that covers this case. The subrogation provision of the Emhart policy provided:

> In the event of any payment under this policy, the Insurer shall be subrogated to the extent of such payment to all the Insureds' rights of

recovery therefor . . . .

Aplt. App. 286. According to Beatrice, National Union did not make a "payment under this policy" because the settlement does not fit the Emhart policy's definition of a "loss." A "loss," in turn, "mean[s] any amount which the Insureds are legally obligated to pay for a claim . . . and shall include damages, judgments, [and] settlements . . ." Aplt. App. 284. Thus, the question is whether or not Vitkus was "legally obligated" to pay any amount in settlement.

As Beatrice points out, the FDIC could not enforce the terms of the settlement agreement. Rather, the settlement agreement declared that had National Union not paid the $26.5 million by the payment deadline, the FDIC's only remedy would have been to cancel the agreement and pursue its legal claims in court. Since the agreement was non-binding, one might conclude that Vitkus (through National Union) paid the FDIC money that he was not "legally obligated to pay."

That reading of the policy, urged upon us here by Beatrice, would eviscerate the protection of all insureds with similar policies who execute even conventional, binding settlement agreements. One could just as easily assert, after all, that prior to entering any settlement agreement, a defendant was not "legally obligated" to pay any money. Defendants can always hold out, insist on taking the case to trial, and await a verdict on the extent of their legal liability.

Similarly, in this case, the defendants could have let the deadline pass and had their liability determined by the district court.

Since one is never legally obligated to enter a settlement, Beatrice's interpretation would therefore render the policy's reference to them a nullity. A more sensible reading derives from the words of the policy itself, which includes within the definition of "loss" "any amount . . . includ[ing] . . . settlements . . . incurred in the defense of actions." Aplt. App. at 284. The plain meaning of this definition indicates that voluntary settlements, entered into as a means to avoid potentially greater liability at trial, should be indemnifiable.

Our reading of "loss" and "legal obligation" under the Emhart policy gives effect to the word "settlement" in the policy. It conserves judicial resources by encouraging settlement and allows insurance companies to avoid the greatly increased potential exposure of the trials that their insureds would undoubtedly insist on if they received no indemnification for settlement payments. We agree with National Union's conclusion that its policy covered Vitkus's payment.

We note here in addition, however, that National Union did not even have to be assured that its reading would be accepted by our court in order to receive indemnification. So long as National Union had a reasonable basis for believing that it was obligated to provide coverage for Vitkus, even as an excess insurer, then it made "payment under its policy." See Weir v. Federal Ins. Co., 811 F.2d

1387, 1395 (10th Cir. 1987) (finding that an insurer can subrogate to the claim of an injured party if it paid that party "with a reasonable or good faith belief in an obligation . . . in making that payment.").

Beatrice asserts that rather than providing protection to Vitkus, National Union paid the global settlement solely to protect its insureds Sherman & Howard and Ronald Jacobs under Sherman & Howard's $30 million general liability policy. According to this argument, Vitkus and the other officers and directors were only included in the settlement with the FDIC to ensure that the entire litigation would come to an end.

This interpretation of events is not supported by the facts. In this case, many of the defendants did not carry insurance, and thus the FDIC knew it could not extract much from them. Vitkus, on the other hand, was one of only three "deep pockets" in the case; he carried $25 million of insurance coverage. In other words, if a jury verdict was returned against Vitkus, the FDIC was certain to collect that sum. It is illogical to believe, as Beatrice's argument requires us, that the FDIC did not take this into account in determining their asking price for a settlement. They would not have allowed Vitkus, a $25 million possibility, to simply append his name to an already completed settlement agreement for no additional consideration. Rather, under these facts, we can only conclude that the global settlement reflected in part a payment by National Union under Vitkus's

Emhart policy, as well as under Sherman & Howard's policy. This was the factual finding of the district court, which we reverse only if clearly erroneous. First Federal Savings & Loan v. Transamerica Title Ins. Co., 19 F.3d 528, 530 (10th Cir. 1994). There was no clear error here. In fact, the district court's finding was accurate and consistent with the facts. We hold that National Union is properly the subrogee of Vitkus.

## II.  Beatrice's Duty to Indemnify

Beatrice argues that even if National Union is Vitkus's subrogee, it does not have an obligation to indemnify Vitkus. Beatrice contends that the settlement did not constitute a "loss" under its insurance, as defined by the Lloyd's policy, because Vitkus (1) never actually paid anything from his own funds and, once again, (2) that Vitkus never became "legally obligated to pay" any portion of the settlement amount as required by the policy. We disagree with Beatrice on both points.

On Beatrice's first contention, it is irrelevant that National Union paid the $10 million on Vitkus's behalf in the first instance. See Safeway Stores, Inc. v. National Union Fire Ins. Co., 64 F.3d 1282, 1290 (9th Cir. 1995) ("Insistence on a meaningless formality of having the directors and officers pay initially . . . should not be required to secure [insurance] coverage."). The Lloyd's policy only required that Vitkus incur an obligation to pay in order to be entitled to

indemnification.

This leads to the second argument, which is that Vitkus did not incur a "legal obligation" to pay anything. We have already addressed this issue above, in connection with the Emhart policy. The wording of the two policies is identical in all relevant respects, and therefore the same reasoning as that found in Part I.B. of this opinion guides us. We state again that at the time Vitkus agreed to the settlement, he incurred an obligation to pay. The allocation agreement later set the precise amount of that obligation.

### III. Reasonableness of the $10 Million Allocation

The district court determined that the allocation to Vitkus of $10 million of the $26.5 million global settlement with the FDIC was proper under the applicable legal standard under Illinois law, set forth below, and we agree. On appeal, Beatrice contends that the $10 million allocation was made only on the basis of National Union's best interests and not as an actual reflection of Vitkus's liability. In doing so, Beatrice places considerable weight on our prior characterization of the allocation as "terribly inequitable" in a suit brought by National Union against Emhart to recover the $10 million. National Union Fire Ins. Co. v. Emhart Corp., 11 F.3d 1524, 1533 (10th Cir. 1993).

We agree that it is unclear whether the $10 million allocation to Vitkus of the total $26.5 million settlement accurately reflects his liability in the Silverado

debacle. Actual liability, though, is not our guide in evaluating whether a settlement allocation is enforceable. It would be wholly impracticable to charge the district court with trying the Silverado litigation after a successful settlement in order to ascertain Vitkus's and the other settling parties' relative culpabilities.

Rather, under Illinois law, we only ask whether the amount of the settlement allocation reasonably reflected Vitkus's potential exposure in the underlying litigation. See United States Gypsum Co. v. Admiral Ins. Co., 643 N.E.2d 1226, 1244 (Ill. Ct. App. 1994). Gypsum involved a declaratory judgment action instituted by Gypsum, an asbestos manufacturer, seeking insurance coverage for its settlement of numerous lawsuits brought against it. One issue on appeal was whether Gypsum could receive indemnification from its insurers for settlement payments even if Gypsum did not prove that it was actually liable in the settled suits. The court was concerned that Gypsum's settlement, without an accompanying finding of actual liability, would force the insurer to cover a risk that did not actually occur. See id. at 1244. That same concern is present here.

The court held that Gypsum only needed to demonstrate that it had a "reasonable anticipation of liability when it settled the underlying cases." Id. The Illinois court relied on the Second Circuit's opinion in Luria Bros. & Co. v. Alliance Assurance Co., 780 F.2d 1082, 1091 (2nd Cir. 1986) (citation omitted),

where the court, addressing a similar issue, stated:

> In order to recover the amount of the settlement from the insurer, an insured need not establish actual liability to the party with whom it has settled "so long as . . . a potential liability on the facts known to the [insured is] shown to exist, culminating in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the insured."

The Gypsum court underscored two important policy considerations in adopting a legal standard that requires courts to examine only the potential exposure of the settling party, rather than the actual liability of that party. First, if actual liability were the applicable standard, settling defendants would be in the "hopelessly untenable position of having to refute liability in the underlying action until the moment of settlement, and then turn about face to prove liability in the insurance action." Gypsum, 643 N.E.2d at 1244 (quoting Uniroyal, Inc. v. Home Ins. Co., 707 F. Supp. 1368, 1378 (E.D.N.Y. 1988)). Second, requiring an insured to prove the case brought against it in order to receive insurance coverage would dissuade the insured from settling the underlying litigation. Faced with the choice of vigorously defending the underlying tort action or settling it without the hope of insurance coverage, the insured would choose the former. Gypsum, 643 N.E.2d at 1244 (quoting Uniroyal, 707 F. Supp. at 1378).

Both of those concerns are at play in this case. First, Vitkus denied any liability until the time of settlement. A court would look askance at Vitkus if he now definitively claimed actual responsibility for $10 million in damages.

- 18 -

Second, it is not clear to us that Vitkus would have joined the global settlement at all if he knew that he would be required in this action to prove that he was actually liable for his conduct.

With these policy considerations in mind, we find that Gypsum's "reasonable anticipation of liability" standard adequately protects against the risk of forcing an insurer to provide coverage for a liability that never actually existed. This unique case, however, is one short step removed from Gypsum. In addition to the risk of requiring indemnification for a settlement payment in the absence of liability, in this case, the court did not identify the precise amount of Vitkus's payment under the settlement. The settling defendants privately apportioned $10 million to Vitkus after reaching the global settlement with the FDIC. The global settlement agreement did not assign particular amounts of liability to particular defendants; instead, the FDIC's suit against Vitkus was settled as part and parcel of the agreement with twelve other defendants. Despite this added degree of uncertainty, the Gypsum rule applies to this case.

We hold that where a reluctant insurer fails to participate in an insured's settlement discussions, and the insured becomes party to a global settlement agreement, the insured may be indemnified for any amount of the total settlement package for which it can establish a reasonable anticipation of liability. Although this rule does take Gypsum a short step farther than its holding, we find it

justified by the policy considerations underlying that case, as well as the equities of the present situation. While Beatrice had no contractual duty to provide a defense for Vitkus, it had ample opportunity to protect its own interests in limiting Vitkus's liability by accepting Vitkus's invitation to participate in his defense.

Given the sensible reasons supporting application of the "potential exposure" or "reasonable anticipation of liability" rule, we apply the rule in this case. The district court found that the potential exposure of the defendants exceeded $200 million. Although Colorado applies a rule of comparative fault in tort cases, Colo. Rev. Stat. § 13-21-111.5, even in actions brought by the FDIC, FDIC v. Clark, 1989 WL 507007, *1-*3 (D. Colo. 1989), the district court found that Vitkus was still potentially liable for more than $10 million of the total judgment that the FDIC sought.

There was strong evidence presented at trial that Vitkus's own culpability was comparable to that of the other Silverado defendants. In particular, there was evidence before the district court that Vitkus was involved in the "Silverado Swirl," which resulted in losses of $30 million. In determining that Vitkus's potential liability was much more than his $10 million settlement, the district court was correct in considering Vitkus's insurance policy with Lloyd's. See Aplt. App. 61-63; W. Knepper & D. Bailey, LIABILITY OF CORPORATE OFFICERS

AND DIRECTORS § 17.06, Supp. at 248-49 (4th ed. 1988 & Supp. 1992) ("In allocating a settlement among the beneficiaries of the settlement, such relevant factors include . . . (3) the 'deep pocket' factor and its potential effect on the liability of each beneficiary . . . .").

The district court found that the $10,000,000 figure accurately reflected Vitkus's contribution to the settlement. Aplt. App. 63 ("Vitkus could not have avoided the risk of a huge judgment against him without the payment of the $10,000,000 under the Emhart policy by National Union."). This was a factual finding that we review for clear error, First Federal Savings & Loan v. Transamerica Title Ins. Co., 19 F.3d 528, 530 (10th Cir. 1994), and do not upset here. The district court concluded as a matter of law that the $10,000,000 payment was reasonable in light of the "far greater" judgment that Vitkus might have faced at trial. Aplt. App. 62. For the reasons stated above, we agree with the district court's conclusion and affirm its decision that the $10,000,000 allocation is enforceable.

## IV. Are National Union and Beatrice Co-Primary Insurers?

In its final argument, Beatrice alternatively contends that even if it is liable to Vitkus, it should not have to bear the entire burden of the $10 million allocation. It reasons that National Union and Beatrice are co-insurers of Vitkus, and thus, they should split the $10 million pro rata according to the respective

policy limits of the Lloyd's and the Emhart policies. Beatrice's argument is based on an interpretation of the so-called "other insurance" provisions of the two policies: since both the Lloyd's and the Emhart policies only provide Vitkus "excess" coverage for his service on Silverado's board of directors, both insurers must share his liability. We do not reach the merits of this argument, however, because we conclude that Beatrice failed to raise the issue below in the district court and, therefore, waived the right to argue it on appeal.

As a general rule, a federal court of appeals will not consider an issue not passed upon below. Singleton v. Wulff, 428 U.S. 106, 120 (1976). In the years since Singleton, we have articulated the reasons supporting application of this rule. First, appellate review of issues not raised before the district court would waste judicial resources and undermine the need for finality in judgments by requiring us often to remand cases for additional fact finding. See Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 721 (10th Cir. 1993) (citations omitted). In addition, to allow a party to succeed on appeal under a theory that was not raised before the district court would severely frustrate the efforts of our trial courts and unjustly punish appellees who proceed through discovery, trial, and appeal believing that the issues raised below are the only issues that matter. See Bradford v. United States, 651 F.2d 700, 704-05 (10th Cir. 1981).

Beatrice argues that it is merely asking us to construe provisions contained

in insurance policies already at issue in this case, and thus, we should be able to decide the issue as a matter of law. Beatrice has a rosy view of litigation, one to which we do not adhere. Beatrice's argument suggests that Vitkus and National Union would not have presented any additional or different evidence at trial had Beatrice made this co-insurance argument below. That conclusion is not at all clear to us. Had Beatrice argued this issue before the district court, Vitkus and National Union likely would have countered this theory with additional evidence and different legal tactics. Further, Beatrice did not make this argument anywhere in the record, including in either its trial brief or post-trial brief. When given the opportunity to respond at oral argument to Vitkus and National Union's assertion that we should not consider the issue, Beatrice's counsel chose not to address it. There are only three brief references in the record that Beatrice points us to regarding the "other insurance" provisions of the two policies. These cursory references were elicited by Beatrice's attorneys while cross-examining two of Vitkus's and National Union's witnesses. The witnesses' testimony is insufficient to preserve the issue for appeal. Lyons, 994 F.2d at 721 ("'[V]ague, arguable references to [a] point in the district court proceedings do not . . . preserve the issue on appeal.'") (quoting Monarch Life Ins. Co. v. Elam, 918 F.2d 201, 203 (D.C. Cir. 1990)). Accordingly, we hold that Beatrice waived this issue by raising it for the first time on appeal.

**CONCLUSION**

Beatrice has failed to demonstrate that it did not breach its promise to indemnify Vitkus for loss he incurred while serving on Silverado's board of directors. The district court correctly concluded that National Union may recover from Beatrice as Vitkus's subrogee. The district court's determination that the $10 million allocation was enforceable was also correct. Accordingly, we AFFIRM the judgment of the district court.