NATIONAL CRANE CORPORATION, A CORPORATION, APPELLANT, V. OHIO STEEL TUBE COMPANY, A CORPORATION, APPELLEE.

332 N.W.2d 39

Filed March 25, 1983. No. 81-747.

Fredric H. Kauffman and Terry R. Wittler of Cline, Williams, Wright, Johnson & Oldfather, for appellant.

Michael G. Helms of Schmid, Ford, Mooney & Frederick, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

McCOWN, J.

This is an action under various tort and contract theories to recover all or a portion of the cost of conducting a retrofit program to replace all steel tubing manufactured and sold by the defendant to plaintiff and incorporated into cranes manufactured and sold to ultimate users or consumers by the plaintiff. The District Court sustained defendant's demurrers and dismissed plaintiff's petitions. The plaintiff has appealed.

The plaintiff, National Crane Corporation, is a Nebraska corporation which manufactures and sells a diversified line of cranes. The defendant, Ohio Steel Tube Company, is an Ohio corporation engaged in the business of designing and manufacturing various types of steel tubing.

During the period beginning in July 1970 and ending in May 1975, plaintiff purchased sections of welded steel tubing from the defendant for use in the tilt cylinder mechanism of cranes manufactured by plaintiff. During the period of time from January 1, 1971, to June 1, 1976, 1,232 cranes manufactured by plaintiff utilizing the steel tubing purchased from defendant were sold by the plaintiff to various customers.

Failures of the tilt cylinder mechanism of the cranes containing the steel tubing supplied by defendant commenced on April 4, 1973, when the first failure occurred. Three more failures occurred in 1974. Each failure was reported to defendant by plaintiff. Defendant represented to the plaintiff that the first failure was due to an inadequacy of material specification. In two 1974 cases defendant acknowledged the failure was due to an imperfection in the weld, and in the other reported that the

material met specifications and the weld was satisfactory.

In March 1975, following inquiry by plaintiff, defendant advised plaintiff that the tubing which had been and was still being furnished to plaintiff had been thoroughly and completely tested. The last tubing manufactured by the defendant and involved in this case was delivered to plaintiff in May 1975.

Between January 1976 and June 1976 four more cylinder failures occurred, each of which was also reported to defendant. All the cranes involved in this action were sold by June 1, 1976.

In July 1976 plaintiff launched its own internal investigation and analysis of the cylinder failures which were being reported. Three additional cylinder failures occurred between July 22 and November 5, 1976, in one of which a loss of life occurred.

By December 1976 plaintiff's testing and investigation reflected that the failures were not caused by overloading or piston seal leakage and that the cylinder design was adequate. Although plaintiff concluded that the cylinder failure problem must lie with the cylinder material, it was unable to reach specific, precise conclusions on which it could reasonably rely.

On December 29, 1976, plaintiff engaged independent engineering and testing consultants to assist in determining the precise cause of the cylinder failures. Thereafter, and throughout the year 1977, representatives of the plaintiff met with representatives of the defendant, and the defendant was advised of the status of the engineering testing and evaluation being carried on.

Between January 17 and December 7, 1977, four more cylinder failures occurred. In January 1978 defendant formally advised plaintiff that it would not participate in the testing and evaluation program because defendant believed the failures were

not the result of any defects in defendant's manufacturing.

In May 1978 plaintiff was advised by its engineering and technical consultants that material and product defects existed in the welded tubing used in the manufacture of the boom cylinders for plaintiff's cranes. Plaintiff was informed that unexpected failures of the cylinders could occur at any time without warning and that to insure the safety of others the cylinders must be replaced.

Plaintiff undertook a retrofit program to replace all of the potentially dangerous cylinders with suitable and safe substitute cylinders, and expended $1,078,960 in testing and replacing the defective tubing manufactured by defendant and incorporated in cranes manufactured and sold by plaintiff.

Plaintiff filed its petition in this proceeding on June 20, 1980, seeking recovery of the costs and expenses of the retrofit program under three different theories based on the basic facts set out above. The 15 actual failures are not involved. The first cause of action was for breach of express and implied warranties. The second cause of action was for negligent manufacture of tubing known to be dangerous unless carefully made. The third cause of action was pleaded on the basis of strict liability.

The defendant demurred to the petition on the grounds that the first cause of action was barred by the statute of limitations and the other two causes of action were not available for the recovery of economic loss. The District Court sustained the demurrer on those grounds.

Plaintiff filed an amended petition alleging the same facts but seeking recovery under theories of indemnity and contribution. Defendant demurred to the causes of action in the amended petition upon the grounds that they either were barred by the applicable statute of limitations or were unavailable to the plaintiff, the plaintiff being a volunteer in the alleged action. The District Court sustained de-

fendant's demurrer to the amended petition. Plaintiff elected to stand on the original and amended petitions and the court dismissed them. Plaintiff has appealed.

Plaintiff contends that the principles of tort law should be extended to permit plaintiff to recover the economic losses incurred under the retrofit program involved here, and that plaintiff should not be limited to recovery on the contractual basis of express or implied warranties. The argument is that because the plaintiff and defendant might be liable to an ultimate user or consumer of plaintiff's cranes under tort theories of liability if the defective tubing were not replaced, therefore the expense of eliminating that potential tort liability as between plaintiff and defendant is recoverable as a tort claim rather than being recoverable under contract law as a claim for the breach of express or implied warranties under the Uniform Commercial Code.

The great majority of courts which have considered the issue have held that the purchaser of a product pursuant to contract cannot recover economic losses from the manufacturer on claims based on principles of tort law, in the absence of property damage or personal injury from the use of the product. See *Jones & Laughlin Steel v. Johns-Manville Sales,* 626 F.2d 280 (3d Cir. 1980), and cases and authorities there cited.

The line of demarcation between physical harm and economic loss has been said to reflect the line of demarcation between tort theory and contract theory. See *Alfred N. Koplin & Co. v. Chrysler Corp.,* 49 Ill. App. 3d 194, 364 N.E.2d 100 (1977), and cases there cited. "Economic loss" in that case was defined by the court as " 'damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damage to other property * * *.' " *Id.* at 199, 364 N.E.2d at 103.

Chief Justice Traynor analyzed the distinction

which the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss. "He [the manufacturer] can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone." *Seely v. White Motor Co.,* 63 Cal. 2d 9, 18, 403 P.2d 145, 151, 45 Cal. Rptr. 17, 23 (1965).

Dean Prosser, after pointing out that a seller's liability for negligence covers any kind of physical harm, including not only personal injuries but also property damage, said: "But where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule . . . that purely economic interests are not entitled to protection against mere negligence, and so have denied the recovery." W. Prosser, Law of Torts, *Products Liability* § 101 at 665 (4th ed. 1971).

The rule that the purchaser of a product pursuant to contract cannot recover economic losses from the manufacturer under a claim of strict liability in tort has been adopted by this court. In *Hawkins Constr. Co. v. Matthews Co., Inc.,* 190 Neb. 546, 209 N.W.2d 643 (1973), we said: "From a review of the authorities and giving maximum import to the basic doc-

trine of strict tort liability, we feel that the doctrine of strict tort liability was not conceived as a substitute for warranty liability in cases where the purchaser has only lost the benefit of his bargain. . . . If the loss is merely economic, the Uniform Commercial Code has given the purchaser an ample recourse under the particular provisions and requirements of the code." *Id.* at 561-62, 209 N.W.2d at 653.

Sections 323, 395, and 402 A and B of the Restatement (Second) of Torts (1965) all apply to tort liability for "physical harm." The title of § 402 A is "Special Liability of Seller of Product for Physical Harm to User or Consumer." The section then provides: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if . . . ." *Id.* at 347-48.

The Restatement sections referred to are applicable only where the product causes physical harm. Nowhere in the comments or illustrations does the Restatement indicate that the doctrine of strict liability covers economic loss in the absence of physical harm caused by the product. In addition, Neb. Rev. Stat. § 25-21,180 (Reissue 1979) defines a product liability action as an action brought "for or on account of personal injury, death, or property damage caused by" the product. The statute refers only to physical harm, not to economic loss.

Section 402 A specifically applies to liability for physical harm caused to the ultimate user or consumer or to his property. It is the unanimous view of the courts that plaintiffs may utilize a strict liability cause of action to recover for damage to property other than the defective product. That consensus is not present, however, as to damage to the defective product itself.

Damage to the product itself is sometimes characterized as economic loss or indirect loss resulting

from the inability to make use of the defective product or loss of the benefit of the bargain. The difficulty in determining whether to apply strict liability for any type of economic loss results from the distinction between tort doctrine of strict liability and contract theory embodied in the Uniform Commercial Code.

A majority of courts that have considered the applicability of strict liability to recover damages to the defective product itself have permitted use of the doctrine, at least where the damage occurred as a result of a sudden, violent event and not as a result of an inherent defect that reduced the property's value without inflicting physical harm to the product. See *Star Furniture Co. v. Pulaski Furniture Co.,* 297 S.E.2d 854 (W. Va. 1982). In essence, this court has reached the same result. See *Morris v. Chrysler Corp.,* 208 Neb. 341, 303 N.W.2d 500 (1981).

To the extent that *Hawkins Constr. Co. v. Matthews Co., Inc.,* 190 Neb. 546, 209 N.W.2d 643 (1973), held that strict liability in tort may not be used to recover for physical harm to property only, it is disapproved. To hold otherwise would penalize the fortunate persons who escape personal injury and ignore the specific language of § 402 A of the Restatement and a virtually unbroken line of decisions of other courts.

In the case at bar the facts pleaded establish that the damages sought to be recovered are the costs and expenses of removing the defective tubing manufactured by the defendant and replacing it. Such damages are not damages resulting from physical harm caused by the defective product. Instead, they are damages resulting from the purchase of defective or unsatisfactory products.

Plaintiff contends that because the "economic loss" here was incurred to remove a potential future liability in tort, such expenses are recoverable by a tort action under theories of negligent manufacture

or strict liability in addition to an action under a warranty or contract theory.

At this point it should be noted that the parties tacitly concede that, upon the facts pleaded in the instant case, the plaintiff stated a cause of action against the defendant under a warranty or contract theory of liability. That cause of action, however, was barred by the statute of limitations under the Uniform Commercial Code, and the plaintiff does not seriously contend that the sustaining of the demurrer to the first cause of action on that ground was erroneous. Instead, plaintiff's position is that the facts pleaded gave rise to two separate causes of action, one in tort and one in contract under a theory of express or implied warranty.

The proper relationship between tort law and the Uniform Commercial Code dictates that a cause of action for "economic loss" under the facts of the present case be pursued under a warranty or contract theory. The fact that the incurring of replacement costs here also removed a potential future tort liability to ultimate users or consumers does not convert economic loss into physical harm, nor transform a contract warranty cause of action into a product liability tort action. It should again be noted that the 15 cases in which actual failures in defendant's product occurred are not involved in this litigation.

We hold that the purchaser of a product pursuant to contract cannot recover economic losses from the seller manufacturer on claims in tort based on negligent manufacture or strict liability in the absence of physical harm to persons or property caused by the defective product.

Plaintiff's amended petition, relying on the same basic facts, sets out purported causes of action seeking to recover on the basis of indemnity or contribution. Before a right to indemnity or contribution arises, the underlying liability must first be established. In this case defendant has been found not

liable to the plaintiff in contract or in tort on the basic facts pleaded, and therefore cannot be liable to the plaintiff for indemnity or contribution on the same facts.

The action of the District Court in sustaining demurrers to the petition and amended petition was correct and is affirmed.

AFFIRMED.

KRIVOSHA, C.J., concurs in the result.

CLINTON, J., not participating.

BOSLAUGH, J., dissenting.

It has been said that the underlying rationales of the doctrine of product liability are (1) consumer protection and compensation, (2) risk distribution, and (3) deterrence of defective manufacture. Note, *Comparative Contribution and Strict Tort Liability: A Proposed Reconciliation,* 13 Creighton L. Rev. 889 (1980). To require that an injury to a third person must occur before an action for damages in tort arises between the manufacturer and supplier defeats these rationales.

The majority opinion holds that the plaintiff can not recover in tort for what it terms "pure economic loss." The rationale for this is that the plaintiff had a cause of action for such losses under the warranty provisions of the Uniform Commercial Code. Further, because there is no underlying liability in tort to an injured party, and because there was no express contract provision between the parties, the plaintiff has no right to indemnity or contribution.

Generally, a manufacturer is under a duty to protect the consumer from the risk of unreasonable harm and a duty to use due care in product manufacture and design. Thus, in products liability a manufacturer can be sued both in strict tort and negligence. *Kohler v. Ford Motor Co.,* 187 Neb. 428, 191 N.W.2d 601 (1971); *Friedrich v. Anderson,* 191 Neb. 724, 217 N.W.2d 831 (1974). Actions on both theories are also available against the supplier of a component part. *City of Franklin v. Badger Ford*

*Truck Sales,* 58 Wis. 2d 641, 207 N.W.2d 866 (1973). Should the manufacturer be held liable in tort for a defect caused by a supplier, courts permit the manufacturer to recover from the supplier. *Hill v. Joseph T. Ryerson & Son, Inc.,* 268 S.E.2d 296 (W. Va. 1980). However, as indicated in the majority opinion, courts have generally required an injury to person or property and have not permitted an action in tort for pure "economic loss" against a supplier or manufacturer.

The majority reasons that the loss suffered by the plaintiff was an economic one, as there was no claim for injury or property damage to anything other than the product itself. The proper action, it states, was in warranty only. Had an injured party sued National Crane, National Crane would have been permitted recovery from Ohio Steel Tube.

The effect of the decision is to require that some injury occur either to a person or to property before a manufacturer can recover from the supplier of material or a defective party independently in tort or under theories of indemnity or contribution. Such a result is inconsistent with the policies of consumer protection, risk distribution, deterrence, and equity underlying products liability theories.

It would seem that the plaintiff should be entitled to recover independently in tort from the supplier for the losses suffered to retrofit the cranes. Several rationales are available: (1) The loss resulted from the duty to provide a safe product and was not a "pure economic loss"; (2) The Uniform Commercial Code remedy was inappropriate for such losses; (3) The economic loss distinction is a specious one and should be abolished; and (4) It is against public policy to require an injury before a manufacturer can recover from a supplier of defective material or parts.

The expenses incurred in plaintiff's retrofit program do not fall neatly into the category designated "economic loss," for which most jurisdictions do not

permit recovery in tort. " 'Economic loss' is defined as the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." Note, *Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages — Tort or Contract?*, 114 U. Pa. L. Rev. 539, 541 (1966) (definition quoted in *Alfred N. Koplin & Co. v. Chrysler Corp.*, 49 Ill. App. 3d 194, 364 N.E.2d 100 (1977)). Generally, the cases which have held that economic loss is recoverable only under the warranty provisions of the Uniform Commercial Code have dealt with defects which affected the product's performance but did not present an unreasonable risk of harm to persons or property outside of the product itself. See, e.g., *Alfred N. Koplin & Co., supra* (air-conditioner breakdown); *Jones & Laughlin Steel v. Johns-Manville Sales,* 626 F.2d 280 (3d Cir. 1980) (roof material blistered and cracked); *Morrow v. New Moon Homes, Inc.,* 548 P.2d 279 (Alaska 1976) (defects in mobile home); *Fredonia Broadcasting Corp., Inc. v. RCA Corporation,* 481 F.2d 781 (5th Cir. 1973) (defective broadcasting equipment). The rationale behind these cases was expressed in *Seely v. White Motor Co.,* 63 Cal. 2d 9, 18, 403 P.2d 145, 151, 45 Cal. Rptr. 17, 23 (1965): "[A consumer] can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will." Such manufacturer agreements or warranties are covered in the Uniform Commercial Code.

In the present case it would seem that the retrofit program was conducted in order to fulfill both the plaintiff's and the defendant supplier's duty in tort to protect the consumer from the risk of unreasonable harm. Courts have indicated that manufacturers must take post sale remedial measures once an excessive danger is discovered in a product line. *Braniff Airways, Inc. v. Curtiss-Wright Corporation,* 411 F.2d 451 (2d Cir. 1969), *cert. denied* 396 U.S. 959,

90 S. Ct. 431, 24 L. Ed. 2d 423 (duty to remedy defective aircraft engines); *Sterling Drug, Inc. v. Yarrow,* 408 F.2d 978 (8th Cir. 1969) (duty to have detail men personally contact physician regarding side effect of drugs). See discussion of this duty in Ramp, *The Impact of Recall Campaigns on Products Liability,* 44 Ins. Couns. J. 83 (1977). The imposition of such a duty comports with the underlying rationales of products liability.

The plaintiff should be entitled to recover in tort for the losses incurred as a result of the retrofit program, because the expenses were not pure economic losses but, rather, were expenses incurred to fulfill both parties' duty in tort to the consumer. When a manufacturer has conducted a recall program necessitated by the duty to protect the consumer, that manufacturer should have an action in tort against the supplier of a defective part, provided that the defect caused the recall and was the result of negligent manufacture or design, or presented an unreasonable risk of harm. An injury to a third person or to property should not be a prerequisite.

The court reasons that since the warranty provisions of the Uniform Commercial Code provided a remedy, its refusal to extend tort liability is justified. However, it does not seem that the Uniform Commercial Code was designed with such losses in mind, that is, losses which stem from the post sale duty in tort to the consumer. The Uniform Commercial Code is primarily concerned with contract notions of losses on bargains and the expectations of parties. It is neutral on consumer safety. Ribstein, *Guidelines for Deciding Product Economic Loss Cases,* 29 Mercer L. Rev. 493 (1978).

For example, the losses incurred to finance a recall program are consequential, not actual, damages under the Uniform Commercial Code. See Neb. U.C.C. §§ 2-714, 2-715 (Reissue 1980). The test for such damages is whether the losses were foreseeable by the seller at the time of the contracting.

See *Burgess v. Curly Olney's, Inc.,* 198 Neb. 153, 251 N.W.2d 888 (1977). One commentator has stated that this test, when applied to recall situations, requires consideration of other factors, i.e., the willfulness of the breach and the relative sizes of the economic units involved, before an equitable result under the law of contract can be reached. This author proposes legislative changes to handle allocating the risk of loss in recall situations. Stone, *Recovery of Consequential Damages for Product Recall Expenditures,* 1980 B.Y.U. L. Rev. 485; Stone, *Allocation of Risk for Product Recall Expenditures: A Legislative Proposal,* 1975 Det. C.L. Rev. 1. Arguably, the equitable doctrine of contribution may be better suited to the recall situation, as both are based upon tort concepts. See, Jensvold, *A Modern Approach to Loss Allocation Among Tortfeasors in Products Liability Cases,* 58 Minn. L. Rev. 723 (1974); Note, *Comparative Contribution and Strict Tort Liability: A Proposed Reconciliation,* 13 Creighton L. Rev. 889 (1980).

Further, the disclaimer provisions of the Uniform Commercial Code permit a seller to limit his liability for consequential damages, provided the disclaimer is not unconscionable. In strict tort, courts do not permit a disclaimer to bar liability when a person or property is damaged. *Sipari v. Villa Olivia Country Club,* 63 Ill. App. 3d 985, 380 N.E.2d 819 (1978). See *Haugen v. Ford Motor Company,* 219 N.W.2d 462 (N.D. 1974). However, the courts will not apply strict tort where the loss is "economic," and will uphold the disclaimer. The effect of the decision in the present case is to term the costs of fulfilling a duty in tort an "economic loss" and thus permit a supplier to avoid his responsibility for product safety by shifting it to the manufacturer through disclaimer—at least until an accident occurs. To require an accident rather than permit the costs of a preventive recall program to be allocated to the supplier when a disclaimer is present contra-

dicts the policies of consumer protection, risk allocation, and deterrence, upon which the duty to recall is founded.

Thus, the Uniform Commercial Code seems inappropriate as a sole remedy in this situation because it is concerned not with product safety for the intended consumer but with the benefit of the bargain between two commercial entities. In the recall situation the concern is for product safety, and the cost should be borne by the responsible party. Comment, *Comparative Causation, Indemnity, and the Allocation of Losses Between Joint Tortfeasors in Products Liability Cases,* 10 St. Mary's L.J. 587 (1979). A few courts have abolished the economic loss distinction and hold that such loss is recoverable both in tort and warranty. Generally, it is no objection that an alternative remedy was available to the plaintiff.

In *Berg v. General Motors,* 87 Wash. 2d 584, 555 P.2d 818 (1976), plaintiff was permitted to sue in negligence for lost profits. In listing its reasons the court said at 592-93, 555 P.2d at 822-23: "Second, we are not convinced of the accuracy of the statement made in *Curtiss-Wright* at page 482, that: 'It is only when the danger inherent in a defectively made article causes an accident that a cause of action against the manufacturer also arises.' A distinction that would allow recovery if the product in question destroyed the property of another, yet would deny recovery were the same product merely to disintegrate, is a specious one. . . . A manufacturer intending and foreseeing that its product would eventually be purchased by persons operating commercial ventures, owes such persons the duty not to impair that purchaser's commercial operations by a faulty product."

New Jersey has permitted recovery in strict tort for economic losses. *Santor v. A & M Karagheusian, Inc.,* 44 N.J. 52, 66, 207 A.2d 305, 312 (1965) (defect in rug): "[A]lthough the doctrine has been

applied principally in connection with personal injuries sustained by expected users from products which are dangerous when defective . . . the responsibility of the maker should be no different where damage to the article sold or to other property of the consumer is involved." In *Monsanto v. Alden Leeds,* 130 N.J. Super. 245, 259, 326 A.2d 90, 97 (1974), the court said, "Injuries to a man's business can be as detrimental to our society as injuries to his person."

The plaintiff should be able to recover from the supplier under an indemnity or contribution theory. Contribution is an equitable doctrine which divides the losses between tort-feasors. Contribution applies where both parties are under a common liability to the injured party and one party has paid more than his share of the burden. Note, 13 Creighton L. Rev., *supra.* Indemnity, also an equitable concept, transfers the entire loss to the tort-feasor who ought to bear it. *Id.* The right to indemnity or contribution can arise either through express agreement or implication of law. Phillips, *Contribution and Indemnity in Products Liability,* 42 Tenn. L. Rev. 85 (1974). See *Tober v. Hampton,* 178 Neb. 858, 136 N.W.2d 194 (1965).

In product liability actions a manufacturer can seek indemnity from the maker of a defective component part. *Hill v. Joseph T. Ryerson & Son, Inc.,* 268 S.E.2d 296 (W. Va. 1980). The issue presented here is whether a manufacturer can recover under indemnity or contribution if there has been no injury to a third person for which judgment or settlement has been had against the manufacturer.

The reasoning of the majority in the present case appears to follow that expressed in *Waldinger Co. v. P & Z Co., Inc.,* 414 F. Supp. 59, 60 (D. Neb. 1976): "Contribution and indemnification are inchoate rights which do not arise until one tort feasor has paid more than his share of the damages or judgment."

However, it does not appear that a judgment is always required before recovery in contribution or indemnity can be had. Restatement of Restitution § 86, Comment d at 391 (1937), states: "The rule stated in this Section is applicable whether or not suit has been brought by the injured person against the payor. If, however, suit is not brought by the injured person, and the payor seeks restitution from a fellow tortfeasor, it is necessary for him to prove that his payment terminated or reduced a valid claim against the other . . . ." Section 86 at 389 states, "A person who has discharged a tort claim to which he and another were subject is entitled to indemnity or contribution . . . ." The illustrations indicate that settlements are contemplated by this section.

In Restatement (Second) of Torts § 886B at 344 (1979), it is stated: "(1) If two persons are liable in tort to a third person for the same harm and one of them discharges the liability of both, he is entitled to indemnity from the other if the other would be unjustly enriched at his expense by the discharge of the liability."

The Comment states that the basis for indemnity is restitution, which seeks to prevent unjust enrichment. A person confers a benefit when he saves the other from expense or loss.

Indemnity is permitted for settlement of a claim if the indemnitee can prove *at least potential liability* to the third party. *Central Nat. Ins. Co. v. Devonshire Coverage,* 565 F.2d 490 (8th Cir. 1977).

In *Burlington Northern, Inc. v. Hughes Bros., Inc.,* 671 F.2d 279, 283 (8th Cir. 1982), the court said: "As this court recently observed, 'the indemnitee need not prove its legal liability to the injured party when its indemnitor denies liability under a contract and refuses to assume defense of the claim or to otherwise hold the indemnitee harmless for any loss.' . . .

"BN notified Hughes of the claim and requested that it assume responsibility. BN also kept Hughes

informed about the settlement negotiations. Hughes refused to participate in any manner.

"In the present case, BN's potential liability under the FELA was established as a matter of law. . . . Under the FELA, BN possessed a 'nondelegable duty to provide its employees with a safe place to work.' . . . Additionally, BN was liable for its employee's injury if its negligence 'played any part, even the slightest, in producing the injury.' . . . The placement of the wall and the failure to remove the snow and ice were undisputably contributory factors . . . . Thus *the likelihood* that the railroad would be held liable was clearly established and the only issue which should have been submitted to the jury was the reasonableness of the amount of the settlement."

In *Parfait v. Jahncke Service, Inc.,* 484 F.2d 296 (5th Cir. 1973), *cert. denied* 415 U.S. 957, 94 S. Ct. 1485, 39 L. Ed. 2d 572 (1974), the court discussed the equitable concepts underlying implied indemnity between tort-feasors when one has settled an action without the consent of the other. The court held that a showing of potential liability was necessary in order to get indemnity.

In the present case both the manufacturer and the supplier owe a duty to the consumer. When the manufacturer is required to rectify a defect caused by the supplier which, under the law of strict liability, will almost certainly result in liability, the manufacturer should be permitted to maintain an action for indemnity. Such recall expenses terminate a potential valid claim against the supplier. To permit the supplier the benefit of this form of settlement is a form of unjust enrichment which equity seeks to prevent. To require an injury to a third person to occur before indemnity can be had would also seem to violate the principles of equity.

The following rule, suggested by the plaintiff, should be applicable in cases such as this: "One who sells a product in a defective condition unreasonably dangerous to a user or consumer is entitled

to receive indemnity from a supplier of a defective component part for the reasonable costs of remedying the defect, if

"(a) the defective condition is created by the supplier's defective component part;

"(b) the defective product creates a substantial risk of serious injury or loss of life to users or third parties;

"(c) a warning alone would be inadequate to avoid the risk created; and

"(d) the supplier of the defective component part has been given reasonable notice of the existence of the defect and an opportunity to provide, or participate in, the remedial action."

HASTINGS, J., joins in this dissent.