948 F.2d 638
 15 UCC Rep.Serv.2d 1167, 34 Fed. R. Evid. Serv. 813,
Prod.Liab.Rep. (CCH) P 12,965
 LUTZ FARMS, a Colorado general partnership, Glenn E. Lutz, a
general partner, Terry J. Lutz, a general partner,
Ace-Hi Packing Company, Inc., a Colorado
corporation, Plaintiffs-Appellees,
v.
ASGROW SEED COMPANY, a Michigan corporation, Defendant-Appellant.
 No. 89-1137.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 25, 1991.
 
 Elaine A. Menter, Englewood, Colo. (Rodney R. Patula and Nancy L. Van Nest of Pryor, Carney and Johnson, P.C., Englewood, Colo., Britt C. Anderson, Vail, Colo., and Katch, Wasserman & Jobin, Denver, Colo., with her on the brief), for plaintiffs-appellees.
 Donald Lawrence (Ernest Staggs, Jr. of Tilly & Graves, P.C., with him on the brief), Denver, Colo., for defendant-appellant.
 Before McKAY, SEYMOUR, and McWILLIAMS, Circuit Judges.
 McWILLIAMS, Circuit Judge.
 
 The Case of the Double Onion
 I. OVERVIEW
 
 1
 An onion grower near Montrose, Colorado, bought onion seed from a seed company located in Michigan. The onion seed produced numerous double onions which were not commercially salable. The onion grower brought suit against the seed company in the United States District Court for the District of Colorado, charging the seed company with negligence and breach of express and implied warranties, and seeking money damages for economic loss, resultant emotional distress, and exemplary damages.
 
 
 2
 A jury returned verdicts in favor of the onion grower and against the seed company in the amount of $1,219,155.00 for economic loss, $425,000.00 for emotional distress, and $800,000.00 as exemplary damages. Judgment was duly entered on the jury's verdicts, which, when including some prejudgment interest, totalled $2,931,254.96. The seed company appeals.
 
 II. FACTS
 
 3
 Glenn and Terry Lutz are brothers who have been commercial vegetable growers in the Montrose, Colorado area for most of their lives. In 1976 they formed Lutz Farms, a general partnership engaged in the commercial planting, cultivating, harvesting, and selling of onions. Lutz Farms owned three parcels of land totalling approximately 160 acres.
 
 
 4
 Ace-Hi Packing Company, Inc. (hereinafter "Ace-Hi"), a Colorado corporation, was formed in 1977 and was a packing or storage shed which stored, sorted, graded, packed and shipped onions to the market. Most of the onions which Ace-Hi processed came from Lutz Farms. Ace-Hi's stock was owned by Glenn and Terry Lutz, Stan Lutz, another brother, and one Bill English.
 
 
 5
 Asgrow Seed Company (hereinafter "Asgrow"), a Delaware corporation with its principal place of business in Michigan, is engaged in the business of selling seeds, including onion seeds. Glenn Lutz purchased all of the onion seed for Lutz Farms and directed its day-to-day business operations. Since the mid-1970's Glenn Lutz had purchased Brown Beauty onion seed from Asgrow. The Brown Beauty onion seed was a bit more expensive than other onion seed, but apparently was well worth it. Prior to 1984, Lutz Farms had experienced no major problems with the onion seed purchased from Asgrow.
 
 
 6
 In any event, in March of 1984, Glenn Lutz contacted Asgrow and ordered 320 pounds of Brown Beauty onion seed. On March 26, 1984, Asgrow shipped Glenn Lutz 320 pounds of Brown Beauty onion seed from Lot VNH 408 in 16-20 pound pails at a cost of $40.00 per pound. Lutz Farms planted approximately 140 acres in onion seeds during the spring of 1984, using Asgrow's Brown Beauty onion seed from Lot VNH 408 on 130 of those acres. The remaining 10 acres were planted with Brown Beauty onion seed left over from prior purchases. The onion bulbs in these 140 acres became visible in the latter part of August, 1984, and were harvested in September, 1984. The Lutzes claimed that in the 1984 crop there were an excessive number of double onions and onions otherwise misshapen which were not commercially salable.
 
 III. LITIGATION
 
 7
 Lutz Farms, the general partnership, Glenn and Terry Lutz as partners, and Ace-Hi brought suit against Asgrow in the United States District Court for the District of Colorado, claiming that they had suffered certain commercial losses due to genetic defects in Asgrow's VNH 408 Brown Beauty onion seed.[1] More specifically, plaintiffs claimed that these onions grown by Lutz Farms and marketed through Ace-Hi "were rejected by the end customers because of the presence of the double and misshapen onions." They also alleged that buyers who had previously bought from Ace-Hi thereafter refused to buy any onions from Ace-Hi. It was further alleged that because of the excessive number of double and misshapen onions in the 1984 crop, it was economically impossible for Ace-Hi to sort the onions, making it necessary to destroy much of the crop and to sell the remainder of the crop at drastically reduced prices. Finally, plaintiffs alleged that as a result of the failure of the 1984 onion crop, they suffered great economic loss and were forced to file for protection under Chapter 11 of the Bankruptcy Code.
 
 
 8
 By amended complaint, plaintiffs asserted claims against Asgrow based on strict liability in tort, negligence, negligent misrepresentation, breach of express warranty, and breach of the implied warranties of merchantability and of fitness for a particular purpose. In addition, Glenn and Terry Lutz asserted a willful breach of contract claim against Asgrow, and, in connection therewith, sought damages for emotional distress. Lutz Farms, Glenn and Terry Lutz also asked for exemplary damages. By answer, Asgrow denied any liability.
 
 
 9
 An eleven-day jury trial culminated in the submission to the jury of plaintiffs' claims based on negligence, breach of express warranty, and breach of the implied warranty of merchantability. The jury found Asgrow liable on all three of these claims and fixed plaintiffs' damages at $1,219,155.00 ($343,667.00 for Lutz Farms, Glenn and Terry Lutz, and $875,488.00 for Ace-Hi). The jury also found Asgrow liable on the claim asserted by Glenn and Terry Lutz for willful breach of contract, and awarded them damages for emotional distress in the amount of $425,000.00 ($237,500.00 for Glenn and $187,500.00 for Terry). Finally, the jury awarded Lutz Farms, Glenn and Terry Lutz exemplary damages in the amount of $800,000.00.
 
 IV. ISSUES ON APPEAL
 A. Economic Loss Rule
 
 10
 As indicated, one of the plaintiffs' claims submitted to the jury was their claim based on negligence. The jury found Asgrow guilty of negligence as to all plaintiffs, i.e., Lutz Farms, Glenn and Terry Lutz, and Ace-Hi, fixing the collective damage to Lutz Farms, Glenn and Terry Lutz at $343,667.00, and Ace-Hi's damage at $875,488.00. Having submitted the claim based on negligence to the jury, the district court also submitted to the jury the claim for exemplary damages, the same having been sought by Lutz Farms, Glenn and Terry Lutz, but not by Ace-Hi. In this regard, the jury found that Lutz Farms, Glenn and Terry Lutz were entitled to exemplary damages and awarded them an additional $800,000.00.
 
 
 11
 On appeal, Asgrow argues that the district court erred in denying its motion for a directed verdict on plaintiffs' claim based on negligence and in submitting the negligence claim to the jury. The basis for Asgrow's motion for a directed verdict on the negligence claim was the so-called "Economic Loss" rule, which provides that a party to a contract may not sue in tort for a purely economic loss occasioned by a breach of that contract.[2] Such being the case, Asgrow contends that it was also error to have submitted to the jury the claim for exemplary damages, since, although exemplary damages may be awarded in a negligence claim, exemplary damages, under Colorado law, may not be awarded in a breach of contract action as a matter of law.[3] In arguing that the negligence claim should not have been submitted to the jury, Asgrow relies, in particular, on East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) and Jardel Enterprises, Inc. v. Triconsultants, Inc., 770 P.2d 1301 (Colo.App.1988), cert. denied, 770 P.2d 1301 (1989).
 
 
 12
 As indicated, this is a case in diversity, and our task, as was the task of the district court, is to ascertain and apply Colorado law to the end that the result obtained in federal court is the result that would have been reached if this litigation had been pursued in a Colorado court. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 72-73, 58 S.Ct. 817, 819-20, 82 L.Ed. 1188 (1938). The question of whether plaintiffs' negligence claim should be submitted to the jury was fully argued before the district judge, who was of the view that under the rationale of Webb v. Dessert Seed Co., 718 P.2d 1057 (Colo.1986), plaintiffs' claim based on negligence should be submitted to the jury. We agree.
 
 
 13
 In Webb, five Colorado onion growers bought onion plants from a Colorado produce company, which in turn had purchased the onion plants from a Texas farmer, who had grown the plants from onion seeds sold to him by a California importer of onion seeds. After the plants failed to bulb properly and to produce commercially salable onions, the Colorado onion growers sued the Colorado produce company for breach of contract, negligence, and breach of implied warranties. The Colorado produce company then filed a third-party complaint against the Texas farmer on the same grounds. The Texas farmer in turn sued the California importer, alleging breach of the implied warranty of merchantability and negligence. Thereafter, the Colorado produce company asserted a third-party claim in negligence and breach of implied warranties against the California importer. Similarly, the Colorado onion growers amended their complaint and added claims against the California importer for negligence[4] and breach of implied warranties. Finally, the Colorado onion growers filed a claim for breach of implied warranties against the Texas farmer.
 
 
 14
 After a three-week trial, the district court in Webb submitted to the jury the Colorado onion growers' claim against the Texas farmer for breach of warranty and the Colorado onion growers' claim for negligence against the California importer. The jury found that the California importer had been negligent and that the Texas farmer had breached express and implied warranties to the Colorado onion growers and to the Colorado produce company, which by that time had been realigned by the district court as a plaintiff. The jury then awarded total damages in the amount of $521,182.00. On appeal, the Colorado Court of Appeals held, inter alia, that the district court should have granted the motion of the California importer for a directed verdict on the issue of its negligence. On certiorari, the Colorado Supreme Court reversed the Colorado Court of Appeals and reinstated the jury's verdict against the California importer based on negligence. In so doing, the Colorado Supreme Court stated that while the authorities relied on by the court of appeals establish that seed distributors have a duty to properly label seeds, those authorities do not hold that proper labeling is a seed distributor's sole duty. The Colorado Supreme Court then noted that "case law from other jurisdictions establishes that seed distributors also owe a duty of care to avoid foreseeable harm to users." Id. at 1062.
 
 
 15
 As indicated, the district judge in the instant case held that Webb required him to submit to the jury plaintiffs' claim based on Asgrow's alleged negligence. And certainly the Colorado Supreme Court in Webb did hold that the Colorado Court of Appeals erred in setting aside the judgment of the district court in favor of the Colorado onion growers and against the California importer of onion seed on the former's negligence claim against the latter. Such would seem to be at odds with Asgrow's basic argument that under the generally accepted economic loss rule, a party to a contract may not sue in tort for purely economic loss. And, of course, in the instant case we are not concerned with what the law is outside of Colorado, but what the Colorado law is on the issue at hand.
 
 
 16
 Asgrow asserts that we should not blindly follow a literal reading of Webb for several reasons. First, Asgrow points out, and correctly so, that the economic loss rule was not considered in Webb. In this regard, counsel for the plaintiffs notes that the author of the Webb opinion wrote a dissent in Cosmopolitan Homes, Inc. v. Weller, 663 P.2d 1041, 1049 (Colo.1983), a case preceding Webb, which indicates that he was fully aware of the economic loss rule when Webb was decided. Be that as it may, we are disinclined to hold, as it has been suggested we do, that if the economic loss rule had been presented to the Colorado Supreme Court, a different result would have been reached in Webb. Such is speculative. Certainly, at this point in time, Webb stands for the proposition that one who purchases onion seed from a seed distributor may have a claim against the latter in negligence for economic loss, as well as a claim for breach of warranty.
 
 
 17
 Asgrow next argues that the holding in Webb should be disregarded because at the time of Webb the Colorado Supreme Court did not have the benefit of East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), and that if the Colorado Supreme Court had decided Webb after East River, it would have reached a different result in Webb.[5] There is of course a degree of speculation in this reasoning too. In East River, the Supreme Court, exercising its admiralty jurisdiction, held that the manufacturer and designer of certain turbines was not liable in tort for economic loss incurred by a shipbuilder when the turbines malfunctioned and resulted in a delay in getting the ships chartered and in operating condition. In thus holding, the Supreme Court stated that whether an action is couched in terms of negligence or strict liability, no products liability claim lies in admiralty when a commercial party alleges injury only to the product itself resulting in purely economic loss. According to the Supreme Court, such a claim is most naturally understood as a warranty claim. In the instant case, Asgrow argues that under the rationale of East River, the plaintiffs should not have been allowed to assert a claim based on negligence. We note that this is not the situation where the Colorado Supreme Court would be compelled to follow the rationale of East River. It might, or might not, be persuaded. In the meantime, Webb still stands. Whether the Colorado Supreme Court would have held differently in Webb if East River had preceded Webb is unknown.
 
 
 18
 As its final reason for disregarding Webb, Asgrow relies on Jardel Enterprises, Inc. v. Triconsultants, Inc., 770 P.2d 1301 (Colo.App.1988), cert. denied, 770 P.2d 1301 (1989). In Jardel, the Colorado Court of Appeals, with no mention of East River or Webb, held that where only economic loss is incurred by a breach of a contractual duty, the non-breaching party does not have a cause of action based on negligence. Jardel was not a "seed" case, but instead involved a surveyor who misread building plans and caused the foundation for a building to be placed in the wrong location, requiring the foundation to be relaid and resulting in a sixty-five day delay in the opening of a restaurant. Moreover, Jardel is a decision by the Colorado Court of Appeals, while Webb is a decision by the Colorado Supreme Court. The fact that the Colorado Supreme Court denied certiorari in Jardel does not elevate Jardel to the status of being a decision of the Colorado Supreme Court. In sum, the district court in the instant case did not err in following Webb and submitting plaintiffs' claim of negligence to the jury. It follows that there was no error in submitting to the jury the claim for exemplary damages.
 
 
 19
 B. Disclaimer of Warranties and Limitation of Remedies
 
 
 20
 As indicated, the issue of whether Asgrow had breached express or implied warranties was submitted to the jury, the district court being of the view that there was sufficient evidence of warranties and a breach thereof to require submission of the claims to the jury. On appeal, Asgrow argues that for several reasons the claims based on breach of express and implied warranties should not have been submitted to the jury.
 
 
 21
 As above mentioned, Glenn Lutz had been buying Brown Beauty onion seed from Asgrow since the mid-1970's and had been a satisfied customer. Any disputes between the two were relatively minor and quickly settled. It was in this setting that Glenn Lutz, in March of 1984, placed a verbal order for Brown Beauty onion seed with one of Asgrow's salesmen. At the time the order was placed, there was no mention of warranties, disclaimer of warranties or limitation of remedies. Glenn Lutz testified that in purchasing Asgrow's Brown Beauty onion seed in March, 1984, he was relying on his favorable experience with such seed in prior years. In any event, the seed was sent to Lutz Farms in 16-20 pound pails on March 26, 1984. Thereafter, Lutz Farms was sent a billing invoice from Asgrow dated April 6, 1984. At the bottom of the invoice, as well as on the labels of the 16-20 pound pails, appeared the following language:
 
 
 22
 NOTICE TO BUYER: WARRANTY and DISCLAIMER OF WARRANTIES: Asgrow warrants that the products it sells will be labeled as required by law and that they will conform to the label description. ASGROW MAKES NO OTHER EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE. Any recommendations for use of Asgrow's products or materials or apparatus in connection therewith are based upon Asgrow's best judgment, but there is no warranty of results to be obtained in connection therewith.
 
 
 23
 LIMITATIONS OF LIABILITY: The exclusive remedy for loss or damages due to breach of the foregoing warranty or contract or for negligence or other cause shall be limited to return of purchase price of Asgrow's products and shall not include consequential damages. Claims for defects in Asgrow's products must be presented to Asgrow as soon as practicable and in any event within 30 days after discovery.
 
 
 24
 Based on this disclaimer of warranties and limitation of remedies, Asgrow argues that it was error to have submitted to the jury plaintiffs' claims based on breach of express and implied warranties. In denying Asgrow's motion for a directed verdict on those claims, the district court was of the view that the disclaimer was ineffective under C.R.S. § 4-2-316(1) because it was inconsistent with and negated statements made in Asgrow's promotional brochures and publications, which as a matter of law gave rise to express warranties; that the disclaimer failed to negate the implied warranty of merchantability because it was not "conspicuous," as required by Colorado law; and that the attempted limitation of remedies, under Colorado law, failed in its essential purpose and was "unconscionable." We are disinclined to disturb the district court's understanding of Colorado law as such bears on the present issues.
 
 1. Express Warranties
 
 25
 In his testimony, Glenn Lutz agreed that in purchasing Brown Beauty onion seed from Asgrow in March, 1984, he did not rely on brochures or other promotional literature, but relied on his favorable past experience with the seed. Counsel for Asgrow contends that under Colorado law, a statement in a brochure or other form of literature is not considered an express warranty unless the buyer can show that he relied on it. Such, argues counsel, defeats any claim for breach of an express warranty, since Glenn Lutz did not "rely" on any of Asgrow's literature in placing the 1984 order. C.R.S. § 4-2-313 reads as follows:
 
 
 26
 4-2-313. Express warranties by affirmation, promise, description, sample.
 
 
 27
 (1) Express warranties by the seller are created as follows:
 
 
 28
 (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
 
 
 29
 (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
 
 
 30
 (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.
 
 
 31
 (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.
 
 
 32
 Official Comment 3 to the foregoing statute reads as follows:
 
 
 33
 3. The present section deals with affirmations of fact by the seller, descriptions of the goods or exhibitions of samples, exactly as any other part of a negotiation which ends in a contract is dealt with. No specific intention to make a warranty is necessary if any of these factors is made part of the basis of the bargain. In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement. Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof. The issue normally is one of fact (emphasis added).
 
 
 34
 Although our attention has not been directed to any Colorado cases, there is some Tenth Circuit case law which has bearing. In Norton v. Lindsay, 350 F.2d 46 (10th Cir.1965), a diversity action from Colorado, we considered Colorado's Uniform Sales Act, C.R.S.1963, § 121-1-12, the statutory provision defining express warranties at that time. In applying that statute we stated that there was danger in giving greater effect to the requirement of reliance than it was entitled to and that "as a general rule no evidence of reliance by the buyer is necessary other than the seller's statements were of a kind which naturally would induce the buyer to purchase the goods and that he did purchase the goods." Id. at 49 (quoting 1 S. Williston, Williston on Sales § 206, at 534 (rev. ed. 1948)). See also, Westric Battery Co. v. Standard Elec. Co., 482 F.2d 1307, 1314 (10th Cir.1973) (information disseminated through advertising materials, trade publications, or technical publications representing the quality of the product in question can qualify in law as a warranty); and Colorado-Ute Elec. Ass'n v. Envirotech Corp., 524 F.Supp. 1152, 1156 (D.Colo.1981) (express warranties contained in promotional literature prepared by the seller and furnished to the buyer to induce the purchase of a product became part of the basic bargain between the buyer and the seller).
 
 
 35
 It appears that the majority of jurisdictions which have addressed the issue have found it unnecessary to require reliance from the buyer before a statement by the seller can be considered an express warranty. In Jensen v. Seigel Mobile Homes Group, 105 Idaho 189, 195, 668 P.2d 65, 71 (1983), the Idaho Supreme Court, in considering Official Comment 3, held that a buyer of goods need not rely on an "affirmation of fact or promise" in order for the same to become "part of the basis of the bargain and hence an express warranty." In so holding, the Idaho Supreme Court stated that "advertising material and pamphlets given by manufacturers for distribution by retailers can form the basis of an express warranty." Id.
 
 
 36
 For other jurisdictions which have abandoned the requirement of reliance, see Interco, Inc. v. Randustrial Corp., 533 S.W.2d 257, 261 (Mo.Ct.App.1976); Winston Indus., Inc. v. Stuyvesant Ins. Co., 55 Ala.App. 525, 530, 317 So.2d 493, 497 (1975); Young & Cooper, Inc. v. Vestring, 214 Kan. 311, 521 P.2d 281, 291 (1974); Hawkins Constr. Co. v. Matthews Co., 190 Neb. 546, 209 N.W.2d 643, 655 (1973), rev'd on other grounds, National Crane Corp. v. Ohio Steel Tube Co., 213 Neb. 782, 332 N.W.2d 39 (1983); and Elanco Prod. Co. v. Akin-Tunnell, 474 S.W.2d 789, 793 n. 4 (Tex.Civ.App.1971). See also 2 A. Squillante and J. Fonseca, Williston on Sales § 15-6, at 355-56 (4th ed. 1974) ("[P]erhaps the best general rule would be that no evidence of the buyer's reliance is necessary other than that the seller's statements induced him to buy what the seller had to sell"); and Lord, Some Thoughts About Warranty Law; Express and Implied Warranties, 56 N.D.L.Rev. 509 (1980) (stating that "there are a number of indications that section 2-313 was intended to supplant the reliance requisite of the Sales Act.... The most obvious ... [being the use of] the phrase 'basis of the bargain' ... in lieu of the word reliance," and further noting that a majority of the courts now hold that reliance is unnecessary).
 
 2. Implied Warranty of Merchantability
 
 37
 Colorado law requires that language purporting to exclude or modify the implied warranty of merchantability must include the word merchantability and, in case of a writing, be conspicuous. C.R.S. § 4-2-316(2). The parties agree that Asgrow's disclaimer of warranties contained the word merchantability. However, in refusing to direct a verdict for Asgrow on plaintiffs' claim for breach of the implied warranty of merchantability, the district court found that although the language in Asgrow's disclaimer was printed in a different color, it was "so minute in size and detail" as to render it inconspicuous as a matter of law. We agree.
 
 
 38
 We note first that at the time the order in question was placed, there was no mention of warranties, disclaimers thereof, or limitation of remedies. In fact, the confirming invoice containing the disclaimer was sent by Asgrow after the sale was made and the seeds were shipped, and was never signed by the Lutzes. Further, the disclaimer, which, besides appearing at the bottom of the confirming invoice, was also printed on the labels of the seed pails, was not in larger or bolder type than the other printing on the invoice or on the labels of the seed pails.
 
 
 39
 We also reject the suggestion that because of their prior dealings with Asgrow, the plaintiffs should have known of the disclaimer. In this connection, we note that Glenn Lutz testified at trial that prior to 1984, Asgrow had satisfactorily adjusted some minor problems the Lutzes had encountered with Asgrow products, without ever referring to the disclaimer of warranties language. According to Glenn Lutz' testimony, Asgrow even agreed to pay Lutz Farms consequential damages on one occasion in 1983 after Asgrow discovered that it had inadvertently sent Lutz Farms a different type of onion seed than that ordered by the Lutzes. No evidence in the record before us contradicts this testimony and Asgrow does not challenge it on appeal. We conclude that the district court did not err in submitting to the jury plaintiffs' claim for breach of the implied warranty of merchantability.
 
 3. Limitation of Remedies
 
 40
 Asgrow also argues that by virtue of the limitation of remedies set forth at the bottom of the invoice and on the labels of the seed pails, the plaintiffs were limited to a recovery of the monies which they had paid Asgrow for the onion seed, and nothing more. In this regard, the district court, relying on Leprino v. Intermountain Brick Co., 759 P.2d 835 (Colo.App.1988), held that Asgrow's attempted limitation of remedies failed of its "essential purpose," in violation of C.R.S. § 4-2-719(2), and that Asgrow's attempted exclusion of consequential damages was "unconscionable," in violation of C.R.S. § 4-2-719(3).
 
 
 41
 We are not inclined to disturb the district court's understanding and application of Colorado law. In our view, the district court did not err in refusing to limit plaintiffs to a recovery of the purchase price of the VNH 408 onion seed. See Leprino, 759 P.2d at 837 ("[O]ne situation in which a limitation of remedy to return of the purchase price has been held to fail of its essential purpose is when goods have latent defects which are not discoverable upon receipt and reasonable inspection"); Wenner Petroleum v. Mitsui & Co., 748 P.2d 356, 357 (Colo.App.1987) ("[F]ailure of the essential purpose of a remedy is measured by whether the buyer is deprived of the substantial value of his bargain"); Davis v. M.L.G. Corp., 712 P.2d 985, 991 (Colo.1986) (factors relevant to a finding of unconscionability include: the use of fine print in the portion of the contract containing the provision; the absence of evidence that such a provision was commercially reasonable or should reasonably have been anticipated; and the terms of the contract, including substantive unfairness); and Mullan v. Quickie Aircraft Corp., 797 F.2d 845, 850 (10th Cir.1986) (quoting Davis, 712 P.2d at 991).
 
 
 42
 C. Emotional Distress Caused by a Willful and Wanton Breach of Warranty
 
 
 43
 In addition to damages for economic loss, Glenn and Terry Lutz sought, inter alia, damages for their emotional distress resulting from Asgrow's allegedly willful and wanton breach of express and implied warranties. The jury found, in effect, that Asgrow's breach was willful and wanton and that as a result thereof the Lutzes suffered emotional distress. In this connection, the jury awarded the Lutzes $425,000.00. On appeal, Asgrow argues that the Lutzes' claim for emotional distress should not have been submitted to the jury and that the district court erred in refusing to direct a verdict in Asgrow's favor on such a claim.
 
 
 44
 The parties apparently agree that under Colorado law "damages for mental suffering are recoverable for willful or wanton breach [of contract] when they are a natural and proximate consequence of the breach." Trimble v. City and County of Denver, 697 P.2d 716, 731 (Colo.1985). See also Denver Pub. Co. v. Kirk, 729 P.2d 1004, 1008 (Colo.App.1986); and Smith v. Hoyer, 697 P.2d 761, 764 (Colo.App.1984). It is Asgrow's position that there was insufficient evidence that any breach of warranty on its part was willful and wanton or that any emotional distress suffered by the Lutzes was the natural and proximate consequence thereof, and that accordingly, the emotional distress claim should not have been submitted to the jury. The district court was of the view that the evidence was sufficient to warrant submission of this claim to the jury. We agree.
 
 
 45
 The gist of the Lutzes' theory of the case at trial was that Asgrow short-circuited its own internal policies and procedures by failing to test the genetic quality of the seed parent from which the seed sold to the Lutzes was grown, and that this failure to test was a calculated and considered business decision intended to speed up sales and marketing of the onion seed. The record shows that plaintiffs presented evidence in support of this theory. Such would tend to indicate that the failure to test was "willful and wanton," and not inadvertent.
 
 
 46
 We also agree that the question of whether the emotional distress described by the Lutzes was the "natural and proximate" consequence of Asgrow's breach was properly submitted to the jury. Only if there had been no evidence or a mere scintilla of evidence, would the district court have been justified in taking such a factual issue from the jury. Paine, Webber, Jackson & Curtis, Inc. v. Adams, 718 P.2d 508, 518 (Colo.1986). As indicated, Glenn Lutz in 1984 purchased 320 pounds of onion seed at a total cost of $12,800.00. Asgrow obviously knew that the Lutzes were commercial growers. Because of the defective seed, the 1984 crop was a failure and the Lutzes were forced into bankruptcy. The Lutzes testified in some detail concerning their resultant emotional distress. We conclude that the district court did not err in submitting the Lutzes' claim for emotional distress to the jury.
 
 D. Expert Testimony
 
 47
 Robert Ellis, a certified public accountant in Montrose, Colorado, was called as a witness by the plaintiffs and testified concerning the economic loss sustained by the plaintiffs. Asgrow objected to Ellis' testimony, claiming that his method of evaluating such loss was flawed and did not conform to the accepted methodology for evaluating the loss or destruction of an economic enterprise. We think Ellis' testimony was admissible.
 
 
 48
 We note that the United States Supreme Court has held that "the District Court has wide discretion in its determination to admit and exclude evidence ... particularly ... in the case of expert testimony." Hamling v. United States, 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974), reh'g denied, 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974). See also, Wolford v. United States, 401 F.2d 331, 332 (10th Cir.1968). Indeed, a trial judge's decision to admit or exclude expert evidence is to be sustained unless manifestly erroneous. Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962).
 
 
 49
 In addition, Asgrow had its own expert witness who testified, in effect, that Lutz Farms and Ace-Hi were worthless even before the 1984 crop of double onions. In our view, this general line of testimony simply presented another question of fact to be resolved by the jury. "[T]o the extent [Ellis] may have departed from general valuation practices ... [Asgrow] had ample opportunity to elicit these facts and argue them to the jury. It was then for the jury to decide ... whether to accept his opinion and what weight to assign to it." Enercomp Inc. v. McCorhill Publishing Inc., 873 F.2d 536, 550 (2d Cir.1989) (citing Moe v. Avions Marcel Dassault-Bregnet Aviation, 727 F.2d 917, 929-30 (10th Cir.1984), cert. denied, 469 U.S. 853, 105 S.Ct. 176, 83 L.Ed.2d 110 (1984)).
 
 
 50
 Asgrow also objected to Ellis' testimony on the ground that only shortly before trial plaintiffs indicated that they intended to broaden the scope of Ellis' testimony. Specifically, Asgrow contended that on January 9, 1989, eight days before trial, plaintiffs sent Asgrow a revised disclosure report from Ellis in which plaintiffs indicated for the first time that Ellis would testify regarding the ongoing business value of Lutz Farms and Ace-Hi. It appears that a magistrate had earlier held, during a December 7, 1988 pretrial hearing, that while plaintiffs had not properly preserved in their pretrial statement the ability to seek lost profits for years other than the crop year 1984, "the attorneys on both sides should clearly understand that the concept of a damages claim, based on ongoing concern value" had been in the case from the very beginning and that "there [was] no way defendant [could] claim surprise on that issue." It also appears that after announcing his ruling, the magistrate instructed the plaintiffs that if they intended to tender a revised disclosure report from their expert, they needed to do so no later than December 19, 1988.
 
 
 51
 As indicated, plaintiffs did not file a revised report from Ellis until January 9, 1989, apparently because a death in Ellis' family delayed the preparation of such report. In any event, on January 10, 1989, Asgrow moved to exclude testimony by Ellis regarding the ongoing concern value of Lutz Farms and Ace-Hi and, in the alternative, asked the court for a continuance. The district court held a hearing on the matter on January 12, 1989, and declined to exclude this testimony or to continue the trial, which was then only a few days off. However, the district court did permit Asgrow to take a second deposition of Ellis, which it did. We think this was sufficient. Further, we agree with the district court's determination that there was no surprise to Asgrow from Ellis' revised report and that there was no factual basis of bad faith on the part of the plaintiffs in submitting the revised report only eight days before trial. We find no abuse of discretion.
 
 
 52
 Judgments affirmed.
 
 
 
 [1]
 The hybrid Lot VNH 408 was the product of a "seed parent" and a "pollen parent." It was Asgrow's announced policy to test thoroughly the seed parent and the pollen parent to determine genetic quality before selling any seed developed from either parent. In fact, Asgrow used its genetic testing and quality control programs as a primary thrust of its marketing efforts. Plaintiffs claimed that in violation of its own internal procedures, Asgrow failed to test the seed parent from which the seed sold to the Lutzes had been grown
 The record before us shows that seed and pollen parents are rated by Asgrow on a scale from R1 to R5, with R1 being "[a] genetically pure stock" that produces uniform plant types and R5 being "[a] stock which has too many offtypes to be usable." The pollen parent from which the seed sold to the Lutzes was grown had been tested before 1984 and had received a marginal rating of R3. However, the seed parent had never been tested before seed from Lot VNH 408 was offered for sale to the public. When it was tested--after the Lutzes' 1984 crop failed--the seed parent received an R4 rating, "[a] stock which should not be used except in emergency situations and is definitely scheduled for replacement."
 
 
 [2]
 Asgrow does not argue that there was insufficient evidence of its negligence
 
 
 [3]
 In support thereof, counsel cites Mortgage Finance, Inc. v. Podleski, 742 P.2d 900 (Colo.1987), where the Colorado Supreme Court held that exemplary damages are not recoverable in a breach of contract action
 
 
 [4]
 In Webb, the Colorado onion growers' allegations of negligence charged the California importer with failing to follow its own customs and practices. 718 P.2d at 1062. As the Colorado Supreme Court stated, the California importer "failed to follow its normal practice of testing all new varieties of seeds under likely growing conditions prior to placing them in the market." Id
 
 
 [5]
 The Webb opinion was filed on May 5, 1986, and rehearing was denied on June 9, 1986. East River was decided June 16, 1986